**Richard A. GORDON, Individually and as President of Independent Investors Protective League, an unincorporated association, and in behalf of the membership thereof and in behalf of all persons similarly circumstanced, Plaintiff,**

v.

**NEW YORK STOCK EXCHANGE, INC., et al., Defendants.**

**No. 71 Civ. 1496.**

United States District Court, S. D. New York.

Dec. 3, 1973.

Bader & Bader, New York City, for plaintiff.

Milbank, Tweed, Hadley & McCloy, New York City, for defendants New York Stock Exchange, Inc. and Bache & Co., Inc.

Lord, Day & Lord, New York City, for defendant American Stock Exchange, Inc.

Brown, Wood, Fuller, Caldwell & Ivey, New York City, for defendant Merrill Lynch, Pierce, Fenner & Smith, Inc.

## MEMORANDUM

LASKER, District Judge.

In this action, brought by Richard A. Gordon, individually and as President of Independent Investors Protective League, against the New York Stock Exchange, the American Stock Exchange ("the Exchanges") and their member firms, plaintiff alleges several violations of the Robinson-Patman Act and the Sherman Act, to the detriment of "small investors" (those ineligible for either "volume discounts" on trades of over 1,000 shares, or negotiated rates on trades above the $500,000 [now $300,000] "break-point").

Specifically, plaintiff attacks the Exchanges' practices of making their facilities available only to members and of limiting the number of memberships; he also alleges that members have conspired with the Exchanges to fix rates for small investors at an unreasonably high level in view of the actual cost of executing a trade; that negotiated rates and volume discounts are set at unreasonably low levels in view of the actual costs of execution; and that this scheme unlawfully discriminates against small investors. In short, plaintiff makes a number of related claims, the essence of which is a broadside attack on the present commission structure of the Exchanges.

Defendants have moved for an order dismissing the action and granting summary judgment on the grounds that the practices complained of are within the

exclusive jurisdiction of the Securities and Exchange Commission, that the SEC, acting pursuant to § 19(b) of the Exchange Act of 1934, 15 U.S.C. § 78s(b), has been actively regulating these practices, and that, consequently, the practices are exempt from the provisions of the antitrust law so that the court is without subject matter jurisdiction.

## I.

We deal first with plaintiff's related claims regarding the Exchanges' practices of limiting the number of memberships, and denying the use of their facilities to non-members unless they pay the same rate of commission charged the general public (Complaint, Paragraph 17).

■ As to the first claim, plaintiff lacks standing to sue since he has not met the threshold requirement of § 4 of the Clayton Act: "Any person who shall be injured in his business or property by reason of any thing forbidden in the antitrust laws may sue therefor . . ." (15 U.S.C. § 15). Since it is undisputed that plaintiff has never made application for membership in either defendant Exchange, he cannot be heard to complain that memberships are arbitrarily limited. See Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183, 187 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); Data Digests, Inc. v. Standard & Poor's Corporation, 43 F.R.D. 386, 387-388 (S.D.N.Y.1967).

■ Plaintiff's second claim must also fail in view of the clear language of the Exchange Act of 1934 to the effect that non-members' access to Exchange facilities is limited. Section 3(a)(3) states:

"The term 'member' when used with respect to an exchange means any person who is permitted either to effect transactions on the exchange without the services of another person acting as broker, or to *make use of the facilities of an exchange for transactions thereon without payment of a fee or with the payment of a commission or fee which is less than that charged the general public,* and includes any firm transacting a business as broker or dealer of which a member is a partner, and any partner of any such firm." (emphasis added)

The fact that the limited membership characteristic of the Exchanges inheres in their very nature has been recognized by the Supreme Court, Silver v. New York Stock Exchange, 373 U.S. 341, 350-351, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) and this Circuit, Robert W. Stark, Jr., Inc. v. New York Stock Exchange, Inc., 346 F.Supp. 217, 228 (S.D. N.Y.1972), aff'd per curiam, 466 F.2d 743 (2d Cir. 1972) CCH Sec.L.Rep. ¶ 93,607.

## II.

■ Plaintiff's claims of price discrimination predicated upon the Robinson-Patman Act, 15 U.S.C. § 13(a), are without merit. The Act requires that the alleged price discrimination be in connection with "commodities of like grade and quality". The authorities are clear that services and intangibles (such as stock trade executions) are not "commodities" within the meaning of the Act. Columbia Broadcasting System v. Amana Refrigeration, 295 F.2d 375 (7th Cir. 1961); Baum v. Investors Diversified Services, Inc., 409 F.2d 872, 875 (7th Cir. 1969), and cases cited therein.

## III.

Plaintiff's remaining claims relating to the commission rate structure of the Exchanges pose the question whether the Exchanges, subject to SEC supervision, can fix commission rates without incurring Sherman Act liability. It is, of course, conceded by defendants that any such immunity must be provided, if at all, by the Securities & Exchange Act of 1934.

The question of the extent to which the 1934 Act exempts the Exchanges from the anti-trust laws has not been

considered in this Circuit since Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). That case involved a non-member ·broker who had secured private wire connections with certain New York Stock Exchange firms. The Exchange had approved Silver's connections on a temporary basis, but subsequently ordered them disconnected without notice or hearing. After observing that the Exchange's actions absent justification from the Exchange Act, would have constituted a *per se* violation of the Sherman Act, the *Silver* court sought to reconcile the "antitrust aim of eliminating restraints on competition with the effective operation of a public policy contemplating that securities exchanges will engage in self-regulation which may well have anti-competitive effects in general and in specific applications." (*Silver*, 373 U.S. at 349, 83 S.Ct. at 1252.)

Noting that the Exchange Act does not give the commission jurisdiction to review *particular instances of. enforcement* of Exchange rules, the Court stated that consequently the question of antitrust exemption did "not involve any problem of conflict or coextensiveness of coverage with the agency's regulatory power," and that court review of the circumstances there presented "is therefore not at all incompatible with the fulfillment of the aims of the [Act]". (*Silver* at 359, 83 S.Ct. at 1258.) The court concluded that the severance of the private wires occurred under "totally unjustifiable circumstances" (*Silver* at 361, 83 S.Ct. 1246) and that no policy of the Exchange Act was served by denial of notice and opportunity for hearing.

In so holding, however, *Silver* did not specify the circumstances in which a federal district court must decline jurisdiction to avoid a possible conflict with the commission, and specifically reserved decision on the possible anti-trust immunity of exchanges where "review of exchange self-regulation [is] provided through a vehicle other than the antitrust laws. . . ." (p. 360, 83 S.Ct. p. 1258).

█ We hold that this court lacks jurisdiction to entertain an anti-trust attack on the commission structure of the Exchanges, since the fixing of commissions falls squarely within the congressional policy of exchange self-regulation embodied in the 1934 Act. Since the Act expressly directs the SEC to supervise the "fixing of reasonable rates of commission" (§ 19(b)(9)), we believe this is the "different case," on which *Silver* reserved decision, where review of exchange self-regulation is available "through a vehicle other than the anti· trust laws" (*Silver*, p. 360, 83 S.Ct. p· 1258).

In so holding, we are in disagreement with the Seventh Circuit. See Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264 (7th Cir. 1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971), a decision to which we return later on.

We believe that while *Silver* quite properly punctured the umbrella of anti-trust immunity claimed by the Exchange, it did not intend Congress' unique self-regulatory scheme to be totally dampened by the continuous interference of an anti-trust court. We read *Silver* as holding that certain limited areas of Exchange regulation—such as potentially anti-competitive and arbitrary conduct directed at non-members —are properly interfered with by a reviewing court since the Act purports to regulate only the conduct of registered exchanges (and their members) with regard to the public, rather than the entire securities business. But *Silver* also contemplates a certain zone of anti-trust immunity in the regulatory process where there is little threat of such arbitrary and discriminatory activity.

Without venturing to describe the full contours of this immunity, we believe that the Exchange Act, as construed by *Silver*, left the power to fix commission rates within the exclusive jurisdiction of the Exchange, subject to commission supervision.

This construction finds ample support in the language of *Silver*. The court describes the Exchanges as "by their nature bodies with a limited number of members" (373 U.S. p. 350, 83 S.Ct. p. 1253) with a "federally mandated duty of self-policing" (p. 352, 83 S.Ct. p. 1254).

> "The pattern of governmental entry . . . was by no means one of total displacement of the exchanges' traditional process of self-regulation . . . Thus the Senate Committee Report stressed that the 'initiative and responsibility for promulgating regulations pertaining to the administration of their ordinary affairs remain with the exchanges themselves. It is only where they fail adequately to provide protection to investors that the Commission is authorized to step in and compel them to do so." S.Rep. No. 792 [73d Cong., 2d Session (1934)] at 13.

The court continues (at 360–361, 83 S. Ct. at 1258–1259) that:

> "The entire public policy of self-regulation, beginning with the idea that the Exchange may set up barriers to membership, contemplates that the Exchange will engage in restraints of trade which might well be unreasonable absent sanction by the Securities Exchange Act. Without the oversight of the Commission to elaborate from time to time on the propriety of various acts of self-regulation, the Exchange is left without guidance and without warning as to what regulative action would be viewed as excessive by an antitrust court. . . . But, under the aegis of the rule of reason, traditional antitrust concepts are flexible enough to permit the Exchange sufficient breathing space within which to carry out the mandate of the Securities Exchange Act."

The clear import of this language is that the Exchange Act sanctions certain "anti-competitive" features of the Exchanges so long as they further the policy of self-regulation and are subject to Commission supervision, guided by the "rule of reason". Indeed, we note that *Silver* sets out at some length (pp. 354–356, 83 S.Ct. 1246, n. 9) the welter of Exchange rules restricting members' relations with non-members, which were there in issue.

In holding that the *manner* of *enforcing* these rules was illegal, *Silver* never intimates that the rules themselves are subject to anti-trust attack, and indeed recognizes the necessity for them (pp. 354–356, 83 S.Ct. 1246).

The facial language of the Exchange Act gives the Exchange and the Commission the power to "fix" commission rates. Section 6(d) of the Act requires that registered exchange adopt rules "just and adequate to insure fair dealing and to protect investors;" that is, § 6(d) mandates self-regulation. As *Silver* observes "[t]he general dimensions of the duty of self-regulation are suggested by § 19(b) of the Act, 15 U.S.C. § 78s(b), which gives the Commission power to order changes in exchange rules respecting a number of subjects . . . ." (pp. 352, 1254). § 19(b) recites:

> "Sec. 19. * * * The Commission is further authorized, if after making appropriate request in writing to a national securities exchange that such exchange effect on its own behalf specified changes in its rules and practices, and after appropriate notice and opportunity for hearing, the Commission determines that such exchange has not made the changes so requested, and that such changes are necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange, by rules or regulations or by order to alter or supplement the rules of such exchange (insofar as necessary or appropriate to effect such changes) in respect of such matters as * * * (9) *the fixing of reasonable rates of commission, interest, listing, and other charges*; (10) *minimum units of trading* . . . ; * * * and (13) similar matters." (emphasis added)

We recognize that the legislative history of the 1934 Act is, perhaps typically, ambiguous as to Congress' intent regarding the Exchanges' long-standing practice of fixing commission rates. As Professor Baxter of Stanford Law School has noted:

"[t]he attention of Congress in 1934 was focused on problems of dishonesty, manipulation, and solvency, and . . . no coherent congressional purpose was articulated concerning the problems of intra-industry competitive structure." Baxter, New York Stock Exchange Fixed Commission Rates: A Private Cartel Goes Public, 22 Stan.L.Rev. 675, 685 (1970).

However, Congress clearly was aware of the Exchanges' rate-fixing practices, since both House and Senate debates on the Act specifically refer to the fixing of commissions. See, e. g., 78 Cong.Rec. 8087, 8092, 8490, 8493–94 (1934).[1]

Nevertheless, however unclear the Congressional debate in 1934 may be as to the permissibility of fixing commissions, we believe the history of Exchange rate-regulation since the passage of the Act is entitled to substantial weight. As to the proper construction of the Act, we cannot overlook the fact that Exchange regulation of fixed commissions has existed virtually unchallenged for nearly 40 years since the passage of the Act.

In the case most in point, Kaplan v. Lehman Brothers, 250 F.Supp. 562 (N. D.Ill.1966), aff'd 371 F.2d 409 (7th Cir. 1967), shareholders of five mutual funds brought a treble damage action against the New York Stock Exchange and several stock brokerage firms claiming that the fixing of minimum commissions was a *per se* violation of the Sherman Act. The Court of Appeals affirmed an award of summary judgment for the defendants since, as the trial court noted, plaintiff's *per se* allegation was defective in light of the weighing process required under *Silver*. Though *Kaplan* is distinguishable on its facts, the court there recognized the possibility of a conflict of jurisdiction with the Commission. Its comments are applicable here since the gist of the complaint in both cases is that plaintiff paid higher rates than would have obtained in the absence of Exchange rate-fixing.

"The plaintiffs have complained of the rates because they are fixed. If they had complained instead that the rates were too high, they would find no support in the antitrust laws. The remedy for a level of rates which is unreasonably high rests with the SEC. Ratemaking is a matter for which the courts are ill-equipped and accordingly a matter traditionally committed to an administrative agency. [citation omitted]. The SEC since its establishment has exercised this power of review over Exchange rates of commission, and it has inaugurated a regular system of reporting from Exchange members to furnish the necessary information.

. . . To leave the determination of reasonableness to the prospective decisions of the agency which is especially qualified and responsible for the general supervision of the industry will assure the intention of Congress as well as the interests of the public." (250 F.Supp. at 566).

We note that, beginning with the 1963 Special Study of The Securities Markets, the SEC and the Exchanges have undertaken intensive examination of Exchange commission structures and related matters. In 1968, the SEC initiated public hearings on the commission rate structure.

Certain rate adjustments, such as the volume discount, and the interim charge, and experiments with negotiated com-

---

1. In Thill Securities Corp. v. New York Stock Exchange, 57 F.R.D. 133 (E.D.Wis.1973), the post-trial brief of the United States, as intervenor, arguing the *illegality* of fixed commis-sion, and the anti-rebate rule concedes that "it cannot be said that Congress intended to outlaw fixed minimum commissions in passing the 1934 Act. (Post-trial brief at pp. 8–9).

missions have resulted from these activities. Most significant, the SEC recently announced, in its Release 10383 (September 11, 1973), its intention to terminate the Exchange practice of fixing minimum commissions on all securities transactions after April 30, 1975, unless the Exchange in the meantime alters its rules to the same effect. It is fair to infer that the SEC is continuing to exercise its jurisdiction actively over rate-setting, pursuant to § 19(b)(9) of the Act.

Moreover, recent developments in Congress regarding the commission structure support the holding here. The Senate recently rejected amendments to the 1934 Act which would have mandated the elimination of fixed commissions within two years. See 119 Cong. Record, S11385–6, June 18, 1973. It is reasonable to infer from the proposal of these amendments that Congress did not believe fixed commissions were already illegal under the anti-trust laws, and, of course, the rejection of the amendments suggests that Congress does not now regard fixed rates as offensive to the Exchange Act or the anti-trust laws.

Finally, we come to the recent decision in Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264 (7th Cir. 1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971).

In *Thill,* a non-member broker-dealer attacked the anti-rebate rule of the New York Stock Exchange as violative of the Sherman Act. The Seventh Circuit reversed the grant of summary judgment in favor of the New York Stock Exchange predicated on a claim of immunity, and remanded the case to the trial court for further evidence on the effects of the anti-competitive acts complained of, the extent to which the rule was subject to actual review by the SEC, and the extent to which the anti-rebate rule was "necessary to make the Securities Exchange Act work." (*Thill,* 433 F.2d at 270).

We believe that *Thill* is distinguishable from our case. First, the Act contains no specific directive to the SEC to supervise member-non-member relations; second, there was before the court no record of active SEC supervision in the area; third, the court thought the power to refuse to share commissions with non-members was a "weapon 'that can be used to injure a particular competitor'" (p. 270) and the plaintiff had alleged that the anti-rebate rule had in fact been unevenly applied.

Indeed, in distinguishing *Kaplan, supra*—another Seventh Circuit case—the *Thill* court placed considerable weight on the distinction it perceived between the non-discriminatory application of fixed commission rates (at issue in *Kaplan*) uniformly charged to the *public,* and the application of rules governing rebates with non-member broker-dealers (433 F.2d p. 270).

We must add, if it is not already clear, that if *Thill* is to be read as holding that an anti-trust court has concurrent jurisdiction with the SEC over *all* potentially anti-competitive practices and rules, we disagree.

For the foregoing reasons, defendants' motion for summary judgment is granted.

In view of our decision here, we do not consider plaintiff's motion for a class action determination.

It is so ordered.