L. John JACOBI and Eugene Geisz, Individually, on behalf of the members of the American Association of Securities Representatives, and on behalf of all other securities representatives similarly situated, Plaintiffs,

v.

BACHE & CO., INC., et al., Defendants.

No. 70 Civ. 3152.

United States District Court,
S. D. New York.

June 3, 1974.

Abraham E. Freedman, New York City, for plaintiffs; Charles Sovel, Edward M. Katz, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for defendant New York Stock Exchange, Inc.; William E. Jackson, Russell E. Brooks, Mark L. Davidson, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants Bache & Co., Inc., Kidder, Peabody & Co., Inc., Dean Witter & Co., Inc., Smith Barney & Co., Inc., Dominick Int'l. Corp.; Marvin Schwartz, James H. Carter, Jr., Richard J. Urowsky, New York City, of counsel.

Seward & Kissel, New York City, for defendant Rauscher Pierce Securities Corp.; Anthony R. Mansfield, Kenneth J. Kelly, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for defendants Lehman Bros., Tucker, Anthony & R. L. Day; Lindsay A. Lovejoy, Jr., New York City, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendants Bear, Stearns & Co., R. W. Pressprich & Co., Inc.; Stephen A. Wiener, Theodore M. Weitz, New York City, of counsel.

A. George Saks, New York City, for defendant Newburger, Loeb & Co.

Gifford, Woody, Carter & Hays, New York City, for defendant Harris, Upham & Co., Inc.; L. Mifflin Hayes, Louis R. Proyect, New York City, of counsel.

E. Michael Growney, Jr., New York City, for defendant Spencer Trask & Co.

Shearman & Sterling, New York City, for defendant W. E. Hutton; Lansing R. Palmer, George J. Wade, New York City, of counsel.

Hall, McNicol, Marrett & Hamilton, New York City, for defendant Thomson & McKinnon Auchincloss, Inc.; William C. Bieluch, Jr., New York City, of counsel.

Breed Abbott & Morgan, New York City, for defendant Walston & Co., Inc.; Joseph P. Dailey, New York City, of counsel.

Nathan Leventon, New York City, for defendant Steiner Rouse & Co., Inc.

Moses & Singer, New York City, for defendant L. F. Rothschild & Co.; Joseph L. Fishman, New York City, of counsel.

Spear & Hill, New York City, for defendant Reynolds & Co.; Eliot H. Lumbard, Laurence M. Grosberg, New York City, of counsel.

Bressler, Meislin, Tauber & Lipsitz, New York City, for defendant Pressman, Frohlich & Frost, Inc.; Steven H. Lipsitz, New York City, of counsel.

Beekman & Bogue, New York City, for defendants Hornblower-Weeks, Hemphill, Noyes, Paine, Webber, Jackson & Curtis; Milton Weiss, New York City, of counsel.

Brown, Wood, Fuller, Caldwell & Ivey, New York City, for defendant Goodbody & Co.; Roger J. Hawke, Thomas J. Mullaney, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendant Loeb, Rhoades & Co.; David R. Hyde, George Wailand, New York City, of counsel.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant Halle & Stieglitz, Inc.; Leslie A. Blau, New York City, of counsel.

Finley, Kumble, Heine, Underberg & Grutman, New York City, for defendant Newburger, Loeb & Co.; Herbert F. Roth, New York City, of counsel.

Guggenheimer & Untermyer, New York City, for defendant Oppenheimer & Co.; Marvin E. Pollock, New York City, of counsel.

## OPINION

ROBERT L. WARD, District Judge.

This is an antitrust action brought by two former registered representatives of member organizations of the New York Stock Exchange, Inc. ("the Exchange") against the Exchange and twenty-seven of its member brokerage firms ("the firms"). Plaintiffs claim to represent the class of all registered representatives employed by the firms from April 2, 1970 through July 25, 1971 who were compensated at least in part by commissions on securities transactions which they effected on the Exchange. This was the period of time during which the Exchange required that a "service charge" of $15 or not more than 50% of the commission be added to the commission charged customers for securities transactions involving under 1,000 shares. Exchange policy, reflected in its Constitution and Rules and in its communications to the firms, required the firms to exclude the service charge from the basis upon which they calculated compensation of the registered representatives. Plaintiffs claim that the

firms' concurrence with the Exchange in this policy constituted an agreement in restraint of trade in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. They seek treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, based upon the difference between their actual compensation during that time period and the amount they would have received had the service charge been included in the basis upon which their commissions were calculated.

For the most part the factual background of this suit is undisputed. During the aforementioned period, member organizations of the Exchange charged commissions for transactions in securities at minimum rates set forth in Article XV of the Exchange Constitution. In turn, they compensated the registered representatives who actually negotiated the transactions, primarily in the form of commissions which were a percentage of the commissions which the firms charged customers. The firms also customarily compensated their registered representatives by salary, bonuses and incentive payments. The precise systems of compensation varied from firm to firm; the percentages applied for the several types of transactions executed, reliance upon a base salary to be supplemented by commission, and incentive or bonus payments were all variable. Direct comparison of the compensation of registered representatives from firm to firm is thus difficult, but the parties do not dispute that competition was in fact intense.

During late 1969 and early 1970 the firms were experiencing a serious financial crisis, operating at increasing losses, particularly in low volume securities transactions. The minimum commission rate had last been increased in 1958, while costs to the industry had risen by some 60%. The Exchange had retained National Economic Research Associates ("NERA") to conduct studies and to assist in the development of a new commission rate structure, and in February of 1970 presented to the Securities and Exchange Commission ("the Commission") NERA's analysis together with its recommendation for a new rate structure. The Commission's response indicated certain unresolved issues and the need for additional data before approval of the new rates; it appeared that approval of a comprehensive new rate structure would require some time. In the meantime, the increasingly acute financial difficulties of some member firms threatened their continued operation. Advised by NERA, the Exchange recommended that the Commission approve an immediate interim charge, to be called a service charge, in the amount of $15 per transaction but not more than 50% of the commission, to be applied to transactions of under 1,000 shares. According to the Exchange Constitution the Board of Governors could impose such a charge immediately by rule; to levy an equivalent charge by changing the commission rate required an amendment to the Exchange Constitution, which would take six to eight weeks to effect. The Commission, the Exchange, and the firms recognized that this was to be an interim measure, pending the more comprehensive adjustment in the commission rate structure. In mid-March of 1970 the Board of Governors approved in principle the imposition of such a service charge and submitted the proposal to the Commission. On April 2, 1970, the Commission approved the service charge for a period of 90 days, subject to review at the end of that time, and upon the conditions that services to small investors not be curtailed, that the income be used wisely for the improvement of the financial position of the member firms, and that the revenue accrue to the firm effecting the transactions. Accordingly, the Exchange did not include the service charge in the basis upon which it calculated its own charge to the firms, amounting at that time to 1% of the commissions each firm collected.

In addition, in a memorandum to the member firms announcing the imposition of the service charge, the Board of Governors of the Exchange called their

attention to Article XV of the Exchange Constitution and to Rule 347(a). It stated that the service charge was not to be passed along directly to the registered representatives as part of their commission. It added, however, that the firms remained free, as always, to compensate their registered representatives according to their own individual policies. Thus, while the service charge could not be passed along directly, in effect the increased revenue could be used at least in part to compensate registered representatives if the firms so chose.

Article XV, § 1 of the Exchange Constitution provided:

No bonus or percentage or portion of a commission, whether such commission be at or above the rates herein established, or any portion of a profit except as may be specifically permitted by the Constitution or a rule adopted by the Board of Governors, shall be given, paid or allowed, directly or indirectly, or as a salary or portion of a salary, to a clerk or person for business sought or procured for any member or allied member of the Exchange or member firm or member corporation.

Article XV, § 9, which provided for service charges, contained similar language requiring that they be free of any rebate or commission unless expressly permitted by rule of the Board of Governors.

Rule 347(a) of the Rules of the Board of Governors authorized compensation to registered representatives, in the form of salary, commission, percentage of the profit of the office, or bonus. It contained no provision for compensation directly based on service charges. Thus, unless the Board of Governors were to amend Rule 347(a), the Constitution forbade directly passing along any of the service charge income to the registered representatives.

The draftsmen of the rules effectuating the service charge at one point contemplated such an amendment to Rule 347(a). A preliminary memorandum, not even officially submitted to the Board of Governors, did contain language to this effect. But the version considered by the Board of Governors on March 18, 1970 did not. Neither party has offered competent testimony concerning the reasons for this change. The Commission itself considered only the later draft, which contained no mention of registered representatives compensation.

At the close of the 90-day period the Commission held public hearings to review the service charge, and conditioned its continuing approval upon additional requirements. For example, it required the Exchange and member firms to treat the service charge as part of commission income for purposes of calculating "regular-way reciprocity" with non-member brokerage firms. The registered representatives had objected to the Exchange's rule prohibiting sharing of the service charge with them. The Commission replied by disclaiming any responsibility to intervene in firms' policies concerning compensation to registered representatives, unless a showing were made that such intervention was necessary for the protection of investors. The Commission then approved indefinite continuance of the service charge, reserving the right to rescind its approval at any time that should appear necessary.

The service charge remained in effect until March 24, 1972, when it was replaced by a revised commission rate schedule. During that time none of the member firms included the service charge in the base commission upon which they calculated the compensation due their registered representatives. Compensation practices of member firms continued to vary widely, and competition for the services of the registered representatives continued unabated. The firms retained the service charge as part of their operating revenue, and the Exchange continued to monitor the effect of the increased revenues upon their profits. The Exchange judged that while to some extent the erosion of capi-

tal and the heavy losses which had prompted the charge had been stemmed, a significant number of firms continued to sustain losses on transactions of under 1,000 shares.

The registered representatives do not contend that the service charge was unnecessary, nor dispute the importance of enacting it quickly. Their claim is that since no additional services were in fact performed, in substance it was a commission rate increase, and should have been considered such for purposes of their compensation. The Exchange's deliberate policy of excluding the service charge from the basis upon which their compensation was calculated, in which the member firms concurred by adhering to the Constitution and Rules of the Exchange, is, plaintiffs claim, a violation of the antitrust laws.

Defendants, on cross-motions for summary judgment prior to trial, contended that the Securities and Exchange Commission had exclusive or primary jurisdiction over this matter, and that the antitrust court was therefore without jurisdiction to decide it. For the reasons which follow, this Court rejected defendants' contention, and set the matter down for a prompt trial on the merits.

In Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the Supreme Court first enunciated the principles underlying the Exchange's antitrust liability, which have been further developed in a series of subsequent lower court decisions. *Silver* involved a non-member broker whose private wire connections with certain member firms the Exchange had unilaterally ordered disconnected, without notice or hearing. The Court observed that absent the regulatory provisions of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78a et seq., the Exchange's action would have constituted a *per se* violation of the antitrust laws. It also noted that the Exchange Act provided no administrative review of the Exchange's action in this instance, and that there-fore the antitrust court was the sole forum in which it could be judged. The Court then articulated the standards which govern the Exchange's antitrust liability. It stated that the securities laws do not provide the Exchange with blanket antitrust immunity, but rather act as an implied repealer of the antitrust laws only to the limited extent necessary to make the securities laws work. The Court saw its task as the reconciliation of the "antitrust aim of eliminating restraints on competition with the effective operation of a public policy contemplating that securities exchanges will engage in self-regulation which may well have anticompetitive effects in general and in specific applications." *Silver*, 373 U.S. at 349.

The Court extensively reviewed the self-regulatory purposes and functions of the Exchange, as well as the supervisory role of the Commission. Briefly stated, those functions are the protection of investors, including safeguarding the financial responsibility of member firms, and insuring fair dealing in securities traded in upon the Exchange. Exchange Act §§ 6, 19; 15 U.S.C. §§ 78f, 78s. But the Court did not determine whether the Commission itself would have primary or exclusive jurisdiction over such questions if the Exchange's action were subject to direct Commission review.

Thill Securities Corporation v. New York Stock Exchange, 433 F.2d 264 (7th Cir. 1970), cert. den., 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971), addressed this question. In that case, plaintiff, a non-member firm, attacked the Exchange's anti-rebate rule, adopted under its self-regulatory authority and subject to review by the Commission. The Court of Appeals reversed the District Court's grant of summary judgment for the Exchange, which had been based on precisely this review jurisdiction of the Commission. It stated that there was no evidence that the Commission was exercising actual and adequate review jurisdiction over the complained-of rule. Even if it were, the Court stat-

ed, acknowledging that the Commission may properly and does in fact consider antitrust principles in exercising its review power, the Commission is not the primary body charged with enforcement of the antitrust laws. Rather, the courts are the primary repository of antitrust expertise, and primarily responsible to enforce principles of competition. The Court of Appeals remanded for factual findings concerning the importance of the rule in making the securities laws work, and its anticompetitive effect. It repeated the standard enunciated in *Silver*, that the task of the Court was to give effect to antitrust principles except insofar as they are necessarily modified in order to fulfill the purposes of the securities laws. In addition, it expressed serious reservations concerning the extent to which the anti-rebate rule could be considered necessary to make the securities laws work.

More recently, in this district, Judge Lasker expressly differed with the analysis of *Thill* in some respects, although he did distinguish the facts of the two cases. Gordon v. New York Stock Exchange, 366 F.Supp. 1261 (S.D.N.Y. 1973), appeal docketed No. 74–1043, 2d Cir. Dec. 6, 1973, involved a challenge to *inter alia* the commission rate structure of the Exchange. Judge Lasker found that since the Exchange Act explicitly authorized the Exchange to fix reasonable rates of commission which are in fact actively reviewed by the Commission, the Court lacked jurisdiction over an antitrust suit against this practice. He stated:

> We believe that while *Silver* quite properly punctured the umbrella of anti-trust immunity claimed by the Exchange, it did not intend Congress' unique self-regulatory scheme to be totally dampened by the continuous interference of an anti-trust court. We read *Silver* as holding that certain limited areas of Exchange regulation —such as potentially anti-competitive and arbitrary conduct directed at non-members—are properly interfered with by a reviewing court since the Act purports to regulate only the con-

duct of registered exchanges (and their members) with regard to the public, rather than the entire securities business. But *Silver* also contemplates a certain zone of anti-trust immunity in the regulatory process where there is little threat of such arbitrary and discriminatory activity. 366 F.Supp. at 1264.

\* \* \* \* \* \*

But distinguishing *Thill*, the Court continued:

> First the Act contains no specific directive to the SEC to supervise member-non-member relations; second, there was before the court no record of active SEC supervision in the area; third, the court thought the power to refuse to share commissions with non-members was a "weapon 'that can be used to injure a particular competitor'" (p. 270) and the plaintiff had alleged that the anti-rebate rule had in fact been unevenly applied.

\* \* \* \* \* \*

> We must add, if it is not already clear, that if *Thill* is to be read as holding that an anti-trust court has concurrent jurisdiction with the SEC over all potentially anti-competitive practices and rules, we disagree. 366 F.Supp. at 1267.

■■ Thus, there emerges the applicable rule concerning not only the jurisdiction of this Court, but also the nature of the analysis required in assessing antitrust liability of the Exchange and its members. Where the concededly self-regulatory rule or practice complained of is within the explicit mandate of the Exchange Act and also is actively reviewed by the Commission, that body may and appropriately should itself consider the policies of both the antitrust and the securities laws. But, where the Act contains no explicit directive to the Commission to supervise the practice or rule, the antitrust court may properly consider it. In so doing, it must evaluate both the policies against restraint of competition and the policies of investor protection and fair dealing in securities.

The case presently before this Court in fact overlaps these two spheres.

■ The service charge itself was a matter over which the Commission possessed and exercised direct regulatory and supervisory authority under 15 U.S.C. § 78s(b). The rule concerning compensation to registered representatives, however, fell only partially within the regulatory function of the Commission. *See,* Merrill Lynch, Pierce, Fenner & Smith v. Ware, 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973). The Commission itself, when the registered representatives protested the rule's effect, declined to intervene in matters affecting the relationship between the member firms and their employees, unless the latter could demonstrate a particular need for intervention for the protection of investors. Instead, the registered representatives have chosen to attack the rule on the ground that it violates the antitrust laws. In view of the Commission's disclaimer of primary responsibility over that aspect of the rule which the registered representatives here contest, and since the focus of the challenge here is in the sphere of the courts' particular antitrust competence, the Court exercises its concurrent jurisdiction over the controversy.

In this connection, we need only briefly consider defendants' claim of total antitrust exemption since acts pursuant to the Exchange's Constitution and Rules constitute its exercise of self-regulatory authority, and, under § 19(b) of the Exchange Act, are the equivalent of government action. *Silver,* as noted above, established that even such self-regulatory activity is not wholly immune from antitrust attack. Rather the nature of the scrutiny, whether by the Commission or the antitrust court, is altered. It is evident that self-regulatory actions taken by the Exchange may go beyond the mandate of § 19(b) of the Exchange Act. The analysis required by *Silver* is an application of traditional antitrust principles of liability, except insofar as the action of the Exchange in the exercise of self-regulatory authority is found to be explicitly required by the Act or necessary to effectuate its purposes.

■ In order to recover in a private antitrust action under § 4 of the Clayton Act, 15 U.S.C. § 15, plaintiffs must establish a causal connection between the alleged antitrust violation and some injury to them. This fact of legal injury must be established with certainty, although at this stage the precise amount of damages may remain somewhat speculative. *See,* Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); Fields Productions, Inc. v. United Artists Corp., 318 F.Supp. 87 (S.D.N.Y.1969), aff'd per curiam, 432 F.2d 1010 (2d Cir. 1970), cert. denied, 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232 (1971); Productive Inventions Inc. v. Trico Products Corp., 224 F.2d 678 (2d Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956).

Defendants contend that plaintiffs have not and cannot establish with certainty any financial loss arising from defendants' actions. They point out that the member firms at all times remained free to negotiate not only the registered representatives' rates of commission, but also all other elements of their compensation, including salary, incentive payments, and bonuses. Thus, it cannot be said with certainty either that the increased revenue was not in fact in some way reflected in the registered representatives' compensations, or conversely, that had the service charge been included in the basis upon which the registered representatives' commissions were calculated, their rates of commission would have remained constant and their actual compensation accordingly increased. Because of these uncertainties, defendants maintain, plaintiffs cannot claim to have been injured as a direct result of defendants' actions.

■ These considerations, however, are more relevant to calculations of the amount of damages should liability be found. Plaintiffs have shown that had the additional revenue been obtained by

way of a commission rate increase rather than a service charge, or had Rule 347(a) been amended to permit passing it along to them, they would have been entitled to share in this increased revenue directly. Because of defendants' actions they were not so entitled. They have therefore demonstrated sufficient legal injury causally related to the actions of defendants to permit further consideration of their claims.

Plaintiffs contend that defendants' action in refusing to pass along the service charge is a horizontal agreement analogous to price fixing and as such is illegal *per se* under the antitrust laws. They further contend that since the service charge was enacted in alleged violation of the Constitution of the Exchange, it cannot fall within the rules of *Silver* and *Thill, supra,* that actions taken by the Exchange pursuant to its authority to make rules, under § 6 of the Exchange Act, 15 U.S.C. § 78f, are not illegal *per se* under the antitrust laws, but rather must be examined to determine whether they are exempt from the application of the antitrust laws because necessary to make the Act work. Two interlocking questions are thus presented.

First is the question whether the manner in which the service charge was adopted precludes application of the particular analysis mandated by *Silver, supra,* for cases involving a conflict between the securities laws and the antitrust laws. If not, the Court will consider the policies of the securities laws as well as of the antitrust laws in determining liability. The second question is whether under a strict antitrust analysis, prior to any consideration of harmony with the securities laws, the action taken by defendants can be considered a *per se* violation. If it is not, then the Court must look to its purpose and its anticompetitive effect before judging it violative of the antitrust laws, *see, e. g.,* Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L. Ed. 683 (1918), rather than confining itself solely to a consideration of whether it was necessary to effectuate the policies of the Exchange Act.

In evaluating whether the rule of *Silver* applies, it is essential to focus first on the Constitution and Rules of the Exchange. As described above, its Constitution in Article XV, § 1, forbids the sharing of *any* commission levied by the firms upon securities transactions with any employee, as commission, salary or bonus, except in accordance with the Constitution or the Rules of the Board of Governors. Article XV, § 9, contains a similar provision with respect to service charges. At the time that the service charge was imposed, the Rules of the Board of Governors provided that the registered representatives could be compensated on a commission or salary basis or by bonus, but did not directly provide for sharing of the service charge revenue. Yet the Board of Governors possessed full authority to amend Rule 347(a) to allow passing along a percentage of the service charge. Conversely, had the charge to obtain additional revenue been imposed by Constitutional amendment, the Board of Governors was fully authorized to forbid, by rule, its inclusion in the basis upon which the commissions of registered representatives were calculated. The evidence introduced at trial showed that the reason for enacting the service charge by way of rule rather than constitutional amendment was the undisputed immediacy of the need for added revenues. Under these circumstances, this Court cannot accept plaintiffs' contention that, as the service charge was in effect a commission increase by another name, this technical irregularity in nomenclature means that the action was not taken in compliance with the requirements of the Exchange Act and therefore must be judged exclusively by the application of antitrust principles.

Therefore the analysis of *Silver* applies. The task of this Court is to reconcile the conflicting policies of the antitrust and securities laws, giving effect to antitrust principles except insofar as

necessary to make the securities acts work.

Plaintiffs next argue that for the Exchange, joined by the firms, to prohibit the direct passing along of a portion of the service charge revenues to the registered representatives constitutes collective employer action to regulate the wages of employees, a horizontal restraint analogous to price fixing, and as such, plaintiffs contend, a *per se* violation of the antitrust laws.

At trial plaintiffs did not contest the Exchange's authority pursuant to § 6 and § 19 of the Exchange Act, generally to make rules concerning the use of commissions charged by member firms to compensate registered representatives. Nor did they then claim that the Exchange's usual exercise of this authority constitutes impermissible price fixing or offer any evidence which so suggested. Plaintiffs at trial simply challenged one particular instance of the Exchange's exercise of its rule making authority, as clearly restrictive of their compensation.[1] Yet, in their proposed conclusions of law, submitted after trial, plaintiffs did request this Court to find Article XV, §§ 1 and 9, and Rule 347(a), unlawful *per se* insofar as they restrict the compensation which the member firms may pay to their registered representatives.

We will consider their arguments first in reference to these provisions as they affected the service charge, and then evaluate them generally.

In support of their claim, plaintiffs argue first that all horizontal agreements in restraint of trade are illegal *per se*; second, that in particular, collective employer action to regulate wages is equivalent to price fixing and *a fortiori* illegal *per se*; and third, that under the cases even indirect or partial price fixing is governed by this *per se* rule.

Plaintiffs cite United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), for the general proposition that all horizontal agreements in restraint of trade are illegal *per se* under the antitrust laws. That case, however, dealt specifically with horizontal agreements to divide territory, and held, for the first time, that all horizontal territorial restrictions violate the antitrust laws without proof of purpose or effect. It based this conclusion on a line of cases all dealing with such territorial restrictions. The case cannot be extended to mandate barring all horizontal agreements of whatever kind or however minimal anticompetitive impact. Indeed, the rule of reason has often been held applicable to horizontal agreements. *See, e. g.*, Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911); Chicago Board of Trade, *supra*.

■ In direct support of the analogy between defendants' action here and price fixing, plaintiffs have cited only Judge Mansfield's decision denying a motion to dismiss an earlier complaint in this case (Cordova v. Bache & Co., 321 F.Supp. 600 (S.D.N.Y.1970) ), and research fails to disclose another. In principle this Court agrees that collective employer action to regulate employee compensation, outside the context of a collective bargaining situation, would constitute price fixing. But it does not follow, as plaintiffs argue, that the Exchange's regulation of the single element of compensation at issue here, in the context surrounding the imposition of the service charge, was a scheme to fix or stabilize prices.

■ Plaintiffs reason from cases dealing with price fixing, and maintain that fixing any one element of a price is always illegal. In fact, the rule is not quite so simple. When the purpose of an agreement is to fix or stabilize prices, even if the means used affects only one element of the price structure, or only indirectly affects prices, the

1. One explanation offered for singling out this instance, that on this occasion the Exchange operated in violation of its own Constitution, as discussed above, is unpersuasive.

agreement is illegal *per se*, without regard to the power of the conspirators in fact to fix prices, or the anticompetitive effects of the scheme, or its economic justification. Thus, distribution systems with the purpose of controlling resale price are illegal, as are fixing maximum or minimum prices, or attempting to build a floor under prices by systematic spot purchases. *See, e. g.*, United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951). But where an arrangement is not on its face a price fixing scheme in purpose, the courts do not apply a *per se* prohibition, looking instead to whether those making the arrangement possess the power or intent to fix prices, and whether prices are actually stabilized to determine whether the behavior in fact amounts to price fixing. Report of the Attorney General's National Committee to Study the Antitrust Laws, 1955, p. 14. Arrangements to exchange marketing information fall into this category, as did a restriction on the period of price making in one segment of trading in one commodity in *Chicago Board of Trade. See, e. g.*, American Column & Lumber Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921); United States v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035 (1923); Maple Flooring Mfrs. Ass'n. v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925); Cement Mfrs. Protective Ass'n. v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925); Chicago Board of Trade, *supra.* If after such examination the court determines that the arrangement is price fixing it is illegal *per se, e. g.*, American Column & Lumber Co., *supra*, if it is not, the traditional rule of reason applies, and the conduct is illegal only if anticompetitive in purpose or effect.

*E. g.*, Maple Flooring Mfrs. Ass'n., *supra;* Chicago Board of Trade, *supra.*

The action plaintiffs contest in this case resembles the latter type of arrangement. While the rule making power of the Board of Governors may give the Exchange and its members the power to stabilize the compensation of registered representatives, this was clearly not the expressed purpose of the service charge. And the rule prohibiting sharing the service charge with registered representatives was designed primarily to enable member firms to retain needed revenue, furthering the purpose which prompted imposition of the service charge, rather than to achieve any uniformity or reduction in the compensation of registered representatives. The effect of the requirement may have been in part that the registered representatives received, in general, less money than they would have absent the prohibition, although this has not been conclusively demonstrated. There was no stabilizing effect on wages, however, and no greater degree of uniformity in the compensation of registered representatives after the service charge was imposed than before. Competition continued unabated, and in at least one case a firm's increased revenue was reflected in an increase in the registered representatives' commission rate.[2] Under these circumstances, this Court does not consider this an arrangement for the purpose of fixing prices. The traditional rule of reason therefore applies. Nor, applying this rule, does this Court find the Exchange's action anticompetitive in purpose or effect.

The same reasoning applies with still more force to the Exchange's general regulation of registered representatives' compensation, through the guidelines set forth in Article XV, §§ 1 and 9, of its Constitution and Rule 347(a). As plaintiffs' own exhibits reveal, the Exchange does not attempt to regulate the exact compensation of the registered representatives in any way, but within very broad guidelines set

---

2. The complaint against that firm, Shearson, Hamill & Co., Inc., was dismissed during the trial.

forth in its Constitution and Rules, allows the firms to establish their own systems of compensation as well as their rates. These broad guidelines have not been used, and it is difficult to imagine how, in their present form, they might be used, to achieve conformity in wages or to reduce competition for the services of registered representatives. This Court does not find either the guidelines or their usual application to constitute an arrangement to fix prices or affect competition.

As noted above, the decisions in *Silver* and *Thill, supra*, require that antitrust liability of the Exchange and its member firms for actions taken pursuant to the Exchange Act, be judged only after appropriate consideration of the policies of the securities laws. *See also* Chief Justice Warren's dissent from the denial of certiorari in Kaplan v. Lehman Bros., 389 U.S. 954, 88 S.Ct. 320, 19 L.Ed.2d 365 (1967). The securities laws are designed to regulate and to some extent stabilize the securities market to ensure protection of investors and fair dealing in securities. First among the Exchange Act's enumeration of matters concerning which the Commission may properly review, alter and supplement the Exchange rules is "(1) safeguards in respect of the financial responsibility of members. . . ." 15 U.S.C. § 78s(b).

In this case, the service charge was approved after actual Commission scrutiny. The Commission judged it necessary for the protection of investors that immediate interim measures be taken to supply additional revenue to rapidly failing brokerage firms. In this sense, the service charge itself was necessary to make the securities laws work. Moreover, to insure that the additional charge to investors was in fact used to further the end for which it was enacted, the Commission formally required that the revenue so generated be retained by the firms effecting the transactions and be used prudently to achieve financial stability. While the Commission did not formally require that the

service charge be excluded from the formulae for compensating registered representatives, and indeed, when the latter objected to the exclusion informed them that this was a matter in which it would not intervene, it is entirely consistent with the purpose for which the charge was levied, that it be so excluded. The revenue was thereby retained at the level judged most crucial, and individual firms remained free to decide for themselves whether to increase the salaries of their employees. In fact, the evidence at trial showed that the revenue generated by the service charge was insufficient to keep the firms from operating at a loss, but at best, merely stemmed the continued erosion of capital and relieved the most acute financial pressure on some of the firms. Thus, the limitations the Exchange imposed themselves furthered the purposes of the securities laws.

In summary, defendants' action in imposing the service charge and prohibiting its direct use in calculating the compensation due registered representatives was not a price fixing scheme or any other *per se* violation of the antitrust laws. Applying the standards of the rule of reason, the Court finds that defendants' action was not taken with any anticompetitive purpose, nor did it have the effect of restricting competition for the services of registered representatives. Moreover, to restrict passing along the revenues directly was consistent with the purpose for which the service charge was effected, namely, to provide essential immediate assistance to rapidly failing brokerage firms. This purpose is well within the recognized aim of the securities laws, protection of investors and smooth and fair administration of the securities markets. Therefore, in the judgment of this Court, defendants have committed no violation of the antitrust laws as charged by plaintiffs.

Plaintiffs also alleged violations of § 340 of the New York General Business Law and of the common law of the states in which the Exchange and

member firms do business. However, plaintiffs offered no proof at trial on these claims and appear to have abandoned them.

Accordingly, the plaintiffs' second amended complaint is dismissed. The foregoing constitutes the findings of fact and conclusions of law of the Court for the purposes of Rule 52, Fed.R.Civ. P.

Settle judgment on notice.