520 F.2d 1231
 Fed. Sec. L. Rep. P 95,253, 1975-2 Trade Cases 60,428
 L. John JACOBI and Robert Gambera, Individually, on behalf
of the members of the American Association of Securities
Representatives, and on behalf of all other securities
representatives similarly situated, Plaintiffs-Appellants,
v.
BACHE & CO., INC., et al., Defendants-Appellees.
 No. 377, Docket 74-2001.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 19, 1974.
Decided Aug. 5, 1975.
 
 Charles Sovel, New York City (Abraham E. Freedman, New York City, of counsel), for plaintiffs-appellants.
 Marvin Schwartz, and William E. Jackson, New York City, for defendants-appellees; Sullivan & Cromwell, James H. Carter, Jr., and Richard J. Urowsky, New York City, of counsel, for defendants-appellees Bache & Co., Inc., Kidder, Peabody & Co., Inc., Dean Witter & Co., Inc., Smith, Barney & Co., Inc., and Dominick International Corp.; Seward & Kissel, Anthony R. Mansfield, and Kenneth J. Kelly, New York City, of counsel, for defendant-appellee Rauscher Pierce Securities Corp.; Simpson, Thacher & Bartlett and Lindsay A. Lovejoy, Jr., New York City, of counsel, for defendants-appellees Lehman Bros. and Tucker Anthony & R. L. Day; Milbank, Tweed, Hadley & McCloy, Russell E. Brooks, and Mark L. Davidson, New York City, of counsel, for defendant-appellee New York Stock Exchange, Inc.; Winthrop, Stimson, Putnam & Roberts, Stephen A. Wiener, and Theodore M. Weitz, New York City, of counsel, for defendants-appellees Bear, Stearns & Co. and R. W. Pressprich & Co., Inc.; Gifford, Woody, Carter & Hays, L. Mifflin Hays, and Louis R. Proyect, New York City, of counsel, for defendant-appellee Harris, Upham & Co.; E. Michael Growney, Jr., New York City, of counsel, for defendant-appellee Spencer Trask & Co., Inc.; Shearman & Sterling, Lansing R. Palmer, and George J. Wade, New York City, of counsel, for defendant-appellee W. E. Hutton; Hall, McNicol, Marett & Hamilton and William C. Bieluch, Jr., New York City, of counsel, for defendant-appellee Thomson & McKinnon Auchincloss Inc.; Breed Abbott & Morgan and Joseph P. Dailey, New York City, of counsel, for defendant-appellee Walston & Co., Inc.; Nathan Leventon, New York City, of counsel, for defendant-appellee Steiner, Rouse & Co., Inc.; Moses & Singer and Joseph L. Fishman, New York City, of counsel, for defendant-appellee L. F. Rothschild & Co.; Spear & Hill, Eliot H. Lumbard, and Lawrence M. Grosberg, New York City, of counsel, for defendant-appellee Reynolds & Co.; Bressler, Meislin, Tauber & Lipsitz and Steven H. Lipsitz, New York City, of counsel, for defendant-appellee Pressman Frolich & Frost, Inc.; Beekman & Bogue and Milton Weiss, New York City, of counsel, for defendants-appellees Hornblower & Weeks-Hemphill Noyes, and Paine, Webber, Jackson & Curtis; Brown, Wood, Fuller, Caldwell & Ivey, Roger J. Hawke, and Thomas J. Mullaney, New York City, of counsel, for defendant-appellee Goodbody & Co.; Cahill, Gordon & Reindel, David R. Hyde, and George Wailand, New York City, of counsel, for defendant-appellee Loeb, Rhoades & Co.; Fried, Frank, Harris, Shriver & Jacobson and Leslie A. Blau, New York City, of counsel, for defendant-appellee Halle & Stieglitz, Inc.; Finley, Kumble, Heine, Underberg & Grutman and Herbert F. Roth, New York City, of counsel, for defendant-appellee Newburger, Loeb & Co.; Guggenheimer & Untermyer and Marvin E. Pollock, New York City, of counsel, for defendant-appellee Oppenheimer & Co.
 Before FRIENDLY, TIMBERS and GURFEIN, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This appeal is from a judgment of the District Court for the Southern District of New York, 377 F.Supp. 86 (1974), which dismissed a treble damage class action under the antitrust laws, 15 U.S.C. §§ 1 and 15, against the New York Stock Exchange (NYSE) and twenty-seven member brokerage firms (member firms). It raises questions upon which we believed the decision of the Supreme Court in Gordon v. New York Stock Exchange, --- U.S. ---, 95 S.Ct. 2598, 44 L.Ed.2d 463 (1975), would shed light. The Court having decided Gordon on June 26, 1975, we now deal with the more difficult problem here presented.
 
 I.
 
 2
 The action was brought by two registered representatives on behalf of all such representatives employed by the defendant firms subsequent to March, 1970 who were compensated at least in part by commissions on securities transactions which they caused to be effected on NYSE.[1] The significance of the March, 1970 date is that it immediately preceded a period when NYSE required imposition of a "service charge" of "not less than the lesser of $15 or 50%" of the minimum commission, for transactions involving less than 1,000 shares.
 
 
 3
 Historically member firms had compensated registered representatives by paying them a percentage of the commissions charged to their customers, although such compensation was integrated with or complemented by a variety of salary, bonus and incentive payments. The percentages, and the mix of such commissions with other compensation arrangements, varied from firm to firm; the district court stated that "the parties do not dispute that competition (for the services of productive representatives) was in fact intense." 377 F.Supp. at 89.
 
 
 4
 What gave rise to the present controversy was this: Article XV, § 1 of NYSE's Constitution, which required member firms to charge minimum commissions, also provided:
 
 
 5
 No bonus or percentage or portion of a commission, whether such commission be at or above the rates herein established, or any portion of a profit except as may be specifically permitted by the Constitution or a rule adopted by the Board of Governors, shall be given, paid or allowed, directly or indirectly, or as a salary or portion of a salary, to a clerk or person for business sought or procured for any member or allied member of the Exchange or member firm or member corporation.
 
 Article XV, § 9 provided:
 
 6
 Members of the Exchange, member firms and member corporations shall make and collect, in addition to minimum prescribed commissions, such other minimum charges with respect to accounts and services as the Board of Directors may from time to time prescribe. Except as may be specifically permitted by a rule adopted by the Board of Directors . . . no bonus or percentage of such charges, whether such charges be the minimum charges prescribed by the Board or greater charges, shall be given, paid, or allowed, directly or indirectly, or as a salary or portion of a salary to a clerk or to any member of the Exchange, member firm or member corporation, or to any other person, firm or corporation for business sought or procured for any member of the Exchange, member firm or member corporation.
 
 
 7
 The apparent force of Article XV, § 1, had been greatly weakened by Rule 347(a), adopted by the Board of Governors, which provided:
 
 
 8
 Pursuant to Section 1 of Article XV of the Constitution, registered representatives may be compensated as follows:
 
 
 9
 (1) registered representatives on a salary or a commission basis,
 
 
 10
 (2) branch office managers on a salary or a commission basis; also, with the prior approval of the Exchange, they may receive a percentage of the net profit of the branch office,
 
 
 11
 (3) a registered representative who is also head of a department of the organization may, with prior approval of the Exchange, receive a percentage of the net profit of his department, and
 
 
 12
 (4) bonuses registered representatives may participate, with the prior approval of the Exchange, in bonus distributions.
 
 
 13
 However, since Rule 347(a) did not refer to service charges, the prohibition of Article XV, § 9, against passing on any portion of a service charge remained in force, although its impact was largely theoretical since, before the matter here in dispute, the last service charge had expired in 1940.
 
 
 14
 During late 1969 and early 1970, NYSE firms were experiencing diminished profits or actual losses on their trading business, owing, they contended, to the absence of any increase in general commission rates since 1958, see Gordon v. New York Stock Exchange, --- U.S. at ---, 95 S.Ct. at 2606. This experience occurred at a time when the exchanges and the SEC were engaged in general discussions about the commission rate structure. NYSE determined that, as an emergency measure to meet what was considered to be a crisis, the additional charge described above should be imposed on transactions of less than 1,000 shares, as to which the existing flat rate commission structure was thought to yield returns incommensurate with costs. We are told that the decision to call this a service charge rather than an added commission was a result of the fact that the Board of Governors could impose such a service charge merely by changing the rules whereas an increase in commissions would demand an amendment to the NYSE Constitution, which would take six to eight weeks to effect.
 
 SEC Rule 17a-8(a) provides:
 
 15
 Each national securities exchange shall file with the Commission three copies of a report of any proposed amendment or repeal of, or any addition to, its rules not less than three weeks (or such shorter period as the Commission may authorize) before any action is taken on such amendment, repeal or addition by the members of such exchange or by any governing body thereof.
 
 
 16
 Pursuant to that rule the president of NYSE on March 19, 1970 forwarded to the Commission copies of a proposed new Rule 383 embodying the service charge. On the same day he distributed the proposed new rule to members with an explanatory statement. This included the following:
 
 
 17
 Although firms should be aware that since this is a minimum service charge, the Exchange Constitution does not permit the charge to be shared in the form of compensation to member firm registered representatives, we would remind firms that they may continue to follow their individual policies in sharing the minimum commission with their sales personnel.
 
 
 18
 Chairman Budge of the SEC responded on April 2. He stated that the Commission would not object to the new rule as an interim measure for a 90-day period only. He added:
 
 
 19
 The Commission expressly predicates its nonobjection to the interim increase in charges upon its expectation that the Exchange will take all steps necessary to assure that full brokerage services for small investors are restored and that transaction size and other limitations on such accounts imposed in the last year by the Exchange's membership will be removed. We also expect that the Exchange will undertake to make certain that the additional revenues produced by the interim surcharge will be received by the member firm obtaining the customer's order and will be prudently employed by its member organizations to improve their operations and financial position.
 
 
 20
 The Board of Governors thereupon adopted a new Rule 383 imposing the service charge, effective April 6 through July 5, 1970.[2]
 
 
 21
 On May 19, 1970, the Association of Investment Brokers, a trade association of registered representatives, sent a telegram to the SEC requesting the Commission to cause NYSE to direct member firms to include the service charge with commissions in computing the compensation paid to registered representatives. Chairman Budge answered with a letter dated June 22. This paraphrased the SEC's April 2 letter of non-objection, a copy of which was enclosed, and went on:
 
 
 22
 The Commission has not interfered with the various compensation arrangements which firms have with their salesmen. We believe that this is a matter for determination by each firm with its registered representatives subject only to the qualification that they act prudently to improve their operations and financial condition where such action is warranted. However, as always, the Commission stands ready to receive evidence from interested persons which demonstrates, with particularity, that additional regulatory action on our part is necessary or appropriate for the protection of investors.
 
 
 23
 During June, discussions between NYSE and the SEC were also being held, in which NYSE sought an extension of the service charge until October 3, 1970. The Commission advised that, while it objected to an extension of the service charge to a fixed date, it would not take action to prevent an indefinite extension provided that this would be terminated if the Commission so required.[3] NYSE agreed. The Commission then held public hearings, in which two spokesmen for registered representatives appeared. One stated "that the imposition of the service charge and the direction by the Stock Exchange that the registered representatives not be permitted to share in that service charge, which rule was not objected to by the Securities and Exchange Commission, is a gross injustice to the registered representative. . . . " SEC counsel interrupted to say that the Commission had not taken a position on the use of the service charge as a basis for computing the compensation of registered representatives and referred to the Chairman's June 22 letter. When the other spokesman took the stand, SEC counsel introduced a form letter sent by the staff to registered representatives who had written the Commission; in substance it repeated the June 22 letter. The service charge remained in effect until March 24, 1972, when a revised commission schedule took effect.
 
 
 24
 At trial, plaintiffs contended that prohibition of use of the service charge as part of the base for computing the compensation of registered representatives under their contracts with the various member firms constituted price fixing which was a per se violation of § 1 of the Sherman Act. Defendants contended, inter alia, that the prohibition was within the antitrust immunity which a district judge had recognized in Gordon with respect to minimum commission rates, 366 F.Supp. 1261, 1264 (S.D.N.Y.1973). As we read Judge Ward's opinion, he rejected both contentions. Although agreeing "in principle" that "collective employer action to regulate employee compensation, outside the context of a collective bargaining situation, would constitute price fixing,"[4] 377 F.Supp. at 95, the judge thought this was not a case for per se liability, but rather one for applying the rule of reason. He continued, id. at 97:
 
 
 25
 Applying the standards of the rule of reason, the Court finds that defendants' action was not taken with any anticompetitive purpose, nor did it have the effect of restricting competition for the services of registered representatives. Moreover, to restrict passing along the revenues directly was consistent with the purpose for which the service charge was effected, namely, to provide essential immediate assistance to rapidly failing brokerage firms. This purpose is well within the recognized aim of the securities laws, protection of investors and smooth and fair administration of the securities markets.
 
 
 26
 The court then concluded that defendants had not violated the antitrust laws and dismissed the complaint.
 
 II.
 
 27
 In light of the decision in Gordon, defendants' claim to antitrust immunity can be restated, borrowing from the Court's language, as follows: "The Securities Exchange Act was intended by the Congress to leave the supervision of the fixing of reasonable rates of commission to the SEC." Interposition of the antitrust laws in such a way as to make the rule governing the distribution of the special service charge a per se violation despite the SEC's letter of non-objection "would preclude and prevent the operation of the Exchange Act as intended by Congress and as effectuated through SEC regulatory activity." Implied repeal of the antitrust laws and consequent immunity from liability for imposing the charge is thus, in the words of Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963), "necessary to make the Securities Exchange Act work." When the SEC issued its initial letter of non-objection, it was on notice that the constitution and the rules of NYSE, which had been filed with it pursuant to § 6(a)(3) of the Act, 15 U.S.C. § 78f(a)(3), prohibited use of the service charge as a base for the computation of compensation for registered representatives. Before the letter of non-objection to the indefinite extension of the special service charge, the SEC had been expressly alerted to this by the May 19, 1970 telegram from the Association of Investment Brokers.[5] Yet the SEC took no action, as it could have done under § 19(b) of the Securities Exchange Act, 15 U.S.C. § 78s(b)(9) to request NYSE to modify its Rule 347(e) to include the service charge.[6]
 
 
 28
 While there is force in the argument, there are several difficulties. It is rather strong medicine to seek to spell out SEC sanction of the enforced omission of the service charge as a basis on which the compensation of registered representatives could be computed under employment agreements when the SEC consistently attempted to stay out of the controversy. More importantly, whereas § 19(b) includes "the fixing of reasonable rates of commission, interest, listing, and other charges" among the illustrations of the sort of matters on which the SEC can request changes in the rules and practices of exchanges, salary arrangements are not specifically included. It would hardly be suggested that if NYSE prescribed a uniform method by which all member firms must compensate registered representatives, or even if it were only to set maximum compensation provisions, and filed rules embodying this with the SEC, that body could grant complete antitrust immunity. Immunizing such an agreement from the antitrust laws would not be "necessary to make the Securities Exchange Act work," Silver, supra, at 357, 83 S.Ct. at 1257; to the contrary, it "would defeat the congressional policy reflected in the antitrust laws without serving the policy of the Securities Exchange Act," id. at 360, 83 S.Ct. at 1258. Even regulatory agencies with express power to grant antitrust immunity have not been authorized to do this in respect of agreements with employees.
 
 
 29
 As we read Gordon, there were two decisive factors that led the Court to find an absolute antitrust immunity. First, the power to fix minimum commission rates had clearly been delegated to NYSE, as shown by the legislative history of the Securities Exchange Act and by § 19(b). --- U.S. at ---, 95 S.Ct. at 2604. Second, the SEC had actively asserted its jurisdiction to review these rates; judicial enforcement of the antitrust laws thus raised the possibility of subjecting the Exchange to different, and perhaps conflicting, standards. Id. at ---, 95 S.Ct. at 2614-2615. Here, by contrast, the Exchange's authority to enforce the rule in dispute existed only at the periphery of its jurisdiction, and the SEC disclaimed the exercise of any power of review. We thus see no reason to find a complete immunity from the antitrust laws in this case.
 
 
 30
 However, the failure of defendants' claim for complete antitrust immunity does not mean that plaintiffs are entitled to prevail. Here we find it useful to return to the analysis in Silver. The Court was there dealing with "collective action of the Exchange and its members" which "had it occurred in a context free from other federal regulation" would "constitute a per se violation of § 1 of the Sherman Act," as a group boycott, 373 U.S. at 347, 83 S.Ct. at 1252. The Court seemingly held that regulation of the conduct at issue was not within the Commission's jurisdiction. Yet the Court did not leap from these two propositions to a conclusion that antitrust liability existed. Instead it said, in a passage of such critical importance here, 373 U.S. at 360-61, 83 S.Ct. at 1258, that we must quote it at length:
 
 
 31
 Yet it is only frank to acknowledge that the absence of power in the Commission to review particular exchange exercises of self-regulation does create problems for the Exchange. The entire public policy of self-regulation, beginning with the idea that the Exchange may set up barriers to membership, contemplates that the Exchange will engage in restraints of trade which might well be unreasonable absent sanction by the Securities Exchange Act. Without the oversight of the Commission to elaborate from time to time on the propriety of various acts of self-regulation, the Exchange is left without guidance and without warning as to what regulative action would be viewed as excessive by an antitrust court . . . . But, under the aegis of the rule of reason, traditional antitrust concepts are flexible enough to permit the Exchange sufficient breathing space within which to carry out the mandate of the Securities Exchange Act. See United States v. Terminal R. Assn. of St. Louis, 224 U.S. 383, 394-95 (32 S.Ct. 507, 509-510, 56 L.Ed. 810); Board of Trade of City of Chicago v. United States, 246 U.S. 231, 238 (38 S.Ct. 242, 243, 62 L.Ed. 683). Although, as we have seen, the statutory scheme of that Act is not sufficiently pervasive to create a total exemption from the antitrust laws, compare Hale and Hale, Competition or Control VI: Application of Antitrust Laws to Regulated Industries, 111 U. of Pa.L.Rev. 46, 48, 57-59 (1962), it is also true that particular instances of exchange self-regulation which fall within the scope and purposes of the Securities Exchange Act may be regarded as justified in answer to the assertion of an antitrust claim.
 
 
 32
 This seems to us to mean that within the area of supervised self-regulation contemplated by the Securities Exchange Act, per se concepts are generally displaced and the courts are to examine whether the particular restraint, even though it would be a per se violation if performed by others, was reasonable. See V Loss, Securities Regulation 3157-62 (1969); Note, Trade Association Exclusionary Practices: An Affirmative Role For the Rule of Reason, 66 Col.L.Rev. 1486, 1497-99 (1966). The Court found liability in Silver not because the challenged conduct was a group boycott but because the failure to provide the plaintiffs with any opportunity for a hearing before they were deprived of their private wire services was unfair and served no policy of the Securities Exchange Act, 373 U.S. at 361, 83 S.Ct. 1246. The departure from per se concepts was emphasized by the Court's statement that one of the virtues of providing an opportunity for a hearing would be to "contribute to the effective functioning of the antitrust court" and "allow the antitrust court to perform its function effectively," 373 U.S. at 362-63, 83 S.Ct. at 1260. If the conduct alleged in Silver's complaint were to be treated as the per se violation that it would have been apart from the effect of the Securities Exchange Act, the antitrust court would not have needed any such assistance.
 
 
 33
 This analysis is strengthened by an examination of the policies that do support per se rules of liability in appropriate antitrust cases. Per se standards can be justified on three grounds: They are more certain than the rule of reason; they obviate the need for elaborate and often fruitless evidentiary inquiries; and they reflect an awareness that a court is not the best forum for making complex economic judgments. United States v. Topco Associates, 405 U.S. 596, 607, 609-10, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); Northern Pacific R.R. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). None of these policies has great force in relation to rules of securities exchanges which are "germane" to performance of the duty of self-regulation, Silver, supra, 373 U.S. at 356, 83 S.Ct. 1246, and are under constant SEC oversight. Rather the rule of reason provides the "breathing space" necessary for the process of supervised self-regulation to work.
 
 
 34
 The questions therefore are whether the rule prohibiting an automatic pass-through of a portion of the service charge to registered representatives was thus "germane" rather than being "wholly foreign to the purposes of the Securities Exchange Act," 373 U.S. at 362, 83 S.Ct. at 1259, and, if the former, whether the rule was consistent with reason. Plaintiffs had the burden of showing that these somewhat related questions should be answered in the negative and they did not meet it. The service charges antecedent to that imposed by Rule 383 had been for services not reflecting sales activities; they were for such matters as custodian services, cutting of coupons, collection of dividends, making of transfers, furnishing transcripts of statements, etc. It was not unreasonable for NYSE to provide that all such charges, which represented a return for the services of many people other than salesmen and for costly facilities, should be retained in full by the member, when there was otherwise complete flexibility with respect to compensation arrangements. Plaintiffs contend that the "service charge" imposed by Rule 383 stands differently, since it relates to a purchase or sale, resembles an added commission, and would have been imposed as such except that this would have required an amendment to NYSE's constitution rather than a new rule. However, this is too superficial a view. A substantial justification for the service charge was that back office costs for a small transaction were almost as great as for a large one and were not being adequately compensated by the flat rate commission structure. Moreover, the service charge had been imposed to meet a financial emergency confronting member firms; if it were treated as a commission, on which registered representatives compensated on a commission basis would automatically receive a percentage,[7] the charge would have had to be correspondingly higher to serve its purpose. Any firm which wished to augment the compensation of a registered representative after imposition of the service charge was free to do this by stepping up his base salary, by increasing his commission rate, or by both. The district court found, 377 F.Supp. at 96:
 
 
 35
 The rule prohibiting sharing the service charge with registered representatives was designed primarily to enable member firms to retain needed revenue, furthering the purpose which prompted imposition of the service charge, rather than to achieve any uniformity or reduction in the compensation of registered representatives. The effect of the requirement may have been in part that the registered representatives received, in general, less money than they would have absent the prohibition, although this has not been conclusively demonstrated. There was no stabilizing effect on wages, however, and no greater degree of uniformity in the compensation of registered representatives after the service charge was imposed than before. Competition continued unabated, and in at least one case a firm's increased revenue was reflected in an increase in the registered representatives' commission rate. (Footnote deleted.)Our review of the record convinces us that these findings were not clearly erroneous.
 
 
 36
 Given that there was no fixing of compensation of registered representatives in general, we do not find that the limited incursion on compensation arrangements here at issue was unreasonable in light of the conditions member firms faced. Rather, the plaintiffs have placed themselves in much the same position as the United States occupied as plaintiff in Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). That case concerned a regulation of the Chicago Board of Trade prohibiting members from purchasing grain "to arrive," during the period between the close of what was termed "the Call" and the opening of the next regular session, at any price other than the closing bid on the Call. The United States proved the existence of the rule, which was price fixing of a sort, and rested. The Court, speaking through Mr. Justice Brandeis, reversed a judgment for the Government and directed dismissal of the bill, holding that the mere existence of the rule was not enough to constitute an antitrust violation, when the effect on competition was slight and the rule served a valuable purpose in the effective working of the Board of Trade. It is true that Chicago Board of Trade preceded United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), which held that a price fixing agreement did not escape antitrust liability simply because the prices were reasonable. But the Trenton Potteries opinion did not purport to overrule Chicago Board of Trade. Rather it distinguished that case on the following ground, quite pertinent here, 273 U.S. at 401, 47 S.Ct. at 381:
 
 
 37
 That decision, dealing as it did with a regulation of a board of trade, does not sanction a price agreement among competitors in an open market such as is presented here. (Emphasis supplied.)
 
 
 38
 The judgment dismissing the complaint is affirmed.
 
 
 
 [1]
 Class action status was recognized by order dated November 1, 1971
 
 
 [2]
 This embodied certain changes, including repeal of any restrictions on the execution of small orders, necessary to conform to the SEC's requirements
 
 
 [3]
 Apparently the SEC's preference for this type of extension was due to a desire to avoid the procedures that would otherwise arise from § 19(b) of the Securities Exchange Act
 
 
 [4]
 Judge Mansfield had previously denied a motion to dismiss the complaint on the basis of the labor exemption in § 6 of the Clayton Act, 15 U.S.C. § 17, Cordova v. Bache & Co., 321 F.Supp. 600 (S.D.N.Y.1970)
 
 
 [5]
 A staff memorandum dated August 20, 1970 indicates awareness that most member firms had made no change in the manner of salesmen's compensation. SEC, Memorandum Re Extension of NYSE Commission Surcharge 11-12 (1970)
 
 
 [6]
 The SEC's failure to take such action may have afforded the Association an opportunity for judicial review. See Independent Broker-Dealers' Trade Ass'n v. SEC, 142 U.S.App.D.C. 384, 442 F.2d 132, 136-43, cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971)
 
 
 [7]
 The evidence showed that most of the defendant firms returned in the neighborhood of one-third of the overall commission to their registered representatives, although some representatives apparently received as much as one-half