Barry DRAYER, Plaintiff-Appellant,

v.

Sidney KRASNER, Leonard Miller, H. Hentz & Co., Inc. and Shearson Hayden Stone Inc., Defendants-Appellees.

No. 256, Docket 77–7364.

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1977.

Decided Jan. 25, 1978.

Malcolm H. Bell, Norwalk, Conn., for plaintiff-appellant.

Philippe M. Salomon, New York City (Willkie, Farr & Gallagher, William T. Sul-

livan, Robert E. Bartkus, and Stephanie G. Heim, New York City, of counsel), for defendants-appellees.

Before FRIENDLY, MANSFIELD and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge:

This action, wherein federal jurisdiction was based on diversity of citizenship, was instituted in the District Court for the Southern District of New York by Barry Drayer against H. Hentz & Co., a New York Stock Exchange (NYSE) firm which had employed Drayer as a registered representative; Shearson Hayden Stone Inc. (Shearson), also a NYSE firm, which was alleged to be Hentz' successor in interest; and two individuals who had been officers of Hentz and had become officers of Shearson. The complaint alleged that defendants had wrongfully terminated Drayer's employment in January 1973 because of his refusal to sign a promissory note for $26,040.73 which Hentz claimed to be due to it; that they falsely represented to NYSE and others that Drayer had been terminated for violation of NYSE's Rule 405(1) (the "know your customer" rule); and that they had withheld wages, salary and commissions. Drayer demanded compensatory damages of $350,000, which included damages for loss of clientele, punitive damages of $150,000, an accounting and costs.

The defendants countered with a motion pursuant to § 3 of the Federal Arbitration Act, 9 U.S.C. § 3, to stay the action pending arbitration "in accordance with the arbitration procedure prescribed in the Constitution and rules" of NYSE, a procedure to which Drayer had agreed in his application to NYSE when he sought employment with Hentz as a registered representative.[1] Drayer filed an affidavit opposing the stay on grounds no longer pressed and a memorandum of law which urged, *inter alia*, that despite the contrary decision by Judge Weinfeld in *Rust v. Drexel Firestone Inc.*, 352 F.Supp. 715 (S.D.N.Y.1972), and by the First Circuit in *Dickstein v. duPont*, 443 F.2d 783 (1971), the arbitration clause, which he had been compelled to accept by NYSE Rule 347, was unenforceable as in violation of the antitrust laws.[2] Judge Weinfeld granted the stay in a brief memorandum in which he did not discuss the antitrust claim, doubtless because he had already rejected this in *Rust, supra*, 352 F.Supp. at 717–18.[3] Drayer made no attempt to appeal from the stay order.

In its answer filed with the NYSE's Arbitration Counsel, Shearson explained Drayer's termination as follows: Defendant Krasner, then a senior vice-president of Hentz, had instructed Drayer not to open a margin account for a particular customer, Corr. Despite this Drayer opened such an account for a firm in which Corr had an interest. The account had to be closed out for nonpayment, leaving an unsecured debit balance of some $36,000, later reduced to $26,000 by a $10,000 check from Corr to Roger Drayer which was deposited with

1. In the alternative compliance was sought with the Code of Arbitration Procedure of the National Association of Securities Dealers (NASD), with which Drayer had agreed to comply in his application to the NASD for registration as a representative of Hentz. Only the NYSE provision, however, has been involved in these proceedings.

2. Paragraph 31(j) of the standard application for registration with the NYSE filed by Drayer provides:

> I agree that any controversy between me and any member or member organization or affiliate or subsidiary thereof arising out of my employment or the termination of my employment shall be settled by arbitration at the instance of any such party in accordance

> with the procedure prescribed in the Constitution and rules then obtaining of the New York Stock Exchange.

This echoes Exchange Rule 347:

> Any controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative by and with such member or member organization shall be settled by arbitration, at the instance of any such party, in accordance with the arbitration procedure prescribed elsewhere in these rules.

3. *Rust* has recently been followed by a district court in this circuit. See *Katz v. Shearson Hayden Stone, Inc.*, 438 F.Supp. 637 (S.D.N.Y., 1977).

Hentz. Hentz' compliance counsel and officers concluded that Drayer was responsible for the loss because of refusal to follow instructions and NYSE Rule 405(1), which required the exercise of due diligence "to learn the essential facts relative to every customer." Krasner thereupon fined Drayer for the amount of the loss. When Drayer refused to acknowledge the indebtedness and sign a note for the amount of the fine, he was discharged for violating Rule 405(1).

The answer then went on:

Subsequently, the activities of Messrs. Roger and Barry Drayer and Corr came under Federal investigation. The grand jury returned an indictment, 75 Crim. 803, (Exhibit "E") naming, inter alia, Corr, Roger Drayer and Barry Drayer. At trial, Corr and Roger Drayer were found guilty; see the attached court docket (Exhibit "F") which shows the convictions of Corr and Roger Drayer for market manipulation, fraud and conspiracy.

The jury was unable to reach a verdict with respect to Barry Drayer and a mistrial was ordered. The office of the U.S. attorney decided that in view of the tremendous amount of time and expense involved in retrying Barry Drayer, it would not be in the public interest to retry him. A motion of nolle prosequi was accordingly entered (Exhibit "G").

Hentz filed a counterclaim for $26,040.73.

At the start of the arbitration Drayer moved for a "mistrial" and the appointment of arbitrators who had not been subjected to the prejudice incident to reading the indictment.[4] The arbitrators requested that an offer of the indictment be withdrawn for the time being but denied the motion for a mistrial, stating that they were in no way prejudiced by what they had read and always made their decision on the facts presented at the particular hearing. In the course of the arbitration the parties exchanged briefs; defendant's brief made the statement:

Indeed, that Respondents [defendants] had just cause and were properly motivated to terminate Drayer's employment is best evidenced by the recent Second Circuit decision, *United States v. Corr et al.*, 543 F.2d 1042 (2d Cir. 1976).

Drayer's counsel asked the arbitrators not to read the *Corr* opinion, which had affirmed the convictions of Corr and Roger Drayer. Defendants' counsel argued, as they had from the outset, that the naming of Drayer in the Corr indictment and in the court's opinion was relevant in the sense that this would have caused Drayer to lose his clientele quite apart from the allegedly wrongful termination of his services and thus would have reduced his damages. The arbitrators entered a unanimous award dismissing both the claims and the counterclaims and assessing costs of $2,450 against Drayer.

Drayer moved to vacate the award primarily because of the prejudice allegedly caused by references to the indictment and to this court's opinion in *Corr*. In a memorandum Judge Weinfeld denied the motion and confirmed the award. He pointed out that arbitrators were not bound by the rules of evidence; that courts were not to serve as appellate tribunals ruling "upon any questions of evidence that may arise in the course of the arbitration," citing, *inter alia, American Almond Products Co. v. Consolidated Pecan Sales Co.*, 144 F.2d 448 (2 Cir. 1944) (L. Hand, J.); and that in any event the indictment was never received in evidence and the arbitrators had stated they had not been prejudiced by it and would render their decision on the evidence received at the hearing.

---

4. Plaintiff had earlier had moved in the district court for a stay of the arbitration or excision of the allegedly prejudicial material from the pleadings. Judge Weinfeld denied the motion on November 9, 1976, on the ground that it was for the arbitrators and not for the court to rule on such questions. Plaintiff contends that at the hearing on this motion, the court advised the defendants to abstain from referring to the indictment. Defendants claim that the court suggested that they withdraw the evidence at that time, which defendants offered to do before the arbitrators, and resubmit it at a later time if they wished. There is no transcript and we see no need to attempt to resolve this factual dispute.

Here Drayer seeks reversal of the order confirming the award on two grounds—the allegedly prejudicial effect of the arbitrators' having read the indictment and the *Corr* opinion and the claimed illegality of the NYSE requirement of arbitration of all disputes between registered representatives and member firms, both generally and because of the make-up of the arbitration panel.

## DISCUSSION

 The first argument need not detain us long. Section 10 of the Arbitration Act, 9 U.S.C. § 10, authorizes the vacating of an award:

(a) Where the award was procured by corruption, fraud, or undue means.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

The only provisions conceivably here applicable are the "undue means" of (a), the "evident partiality . . . in the arbitrators" of (b) or the "any other misbehavior" of (c). The "undue means" of (a), when read in conjunction with "corruption" and "fraud," does not cover a case where a party openly offered evidence even for the sole purpose of causing prejudice,[5] at least when, as here, the arbitrators declined to receive it and stated that they had not been prejudiced and would act only on the evidence before them. The experienced businessmen on the arbitration panel could surely be relied upon to avoid the elemental

error of holding that Hentz' discharge of Drayer on January 15, 1973, for insubordinate conduct and violation of Rule 405(1) was justified by the Government's later discovery of other evidence that led a grand jury to indict him for stock fraud on August 12, 1975, but did not produce the unanimity of guilt beyond a reasonable doubt required to convict him. Still less is there any evidence of "partiality" or "misbehavior" by the arbitrators under (b) or (c). Any suggestion of partiality, of which there is no evidence in any event, is belied by their dismissal of the counterclaim. The Supreme Court's decision in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), vacating an award where there was a close financial relationship between a party and an arbitrator which was not disclosed to the other party, although heavily relied on by the appellant, is quite beside the point. Insofar as *Wilko v. Swan*, 346 U.S. 427, 436–37, 440, 74 S.Ct. 182, 98 L.Ed. 168 (1953), introduced the nonstatutory ground of "manifest disregard" of the law as a basis for vacating arbitration awards, this presupposed "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." *San Martine Compania de Navegacion, S. A. v. Saguenay Terminals Ltd.*, 293 F.2d 796, 801 (9 Cir. 1961); *Saxis S. S. Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 581–82 (2 Cir. 1967); see also *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214 (2 Cir. 1972). Here there is nothing to suggest even "a mere error in the law."

 Coming to Drayer's attack on the validity of the arbitration clause, we must first determine whether his failure to appeal from the order staying the action pending arbitration prevents him from raising this claim now. If, as held in *Dickstein v. duPont, supra*, 443 F.2d at 784 n. 1, the district court's stay of the action pending arbitration under § 3 of the Federal Arbi-

---

5. Although appellees were not too discriminating in their introduction of the evidence, it was relevant to Drayer's claim of large damages from the loss of clientele resulting from his discharge.

tration Act had been "appealable as a final order under 28 U.S.C. § 1291," Drayer might well be so precluded.[6] But it was not. Our decision in *Chatham Shipping Co. v. Fertex S. S. Corp.*, 352 F.2d 291, 294 (1965), which the *Dickstein* court cited as authority for the statement just quoted dealt with an order in an independent proceeding under § 4 to compel arbitration, not with an order in a pending action staying the action during arbitration. Although the order reviewed in *Dickstein* was indeed appealable, appeal lay under § 1292(a)(1) authorizing appeal from an interlocutory order granting an injunction under the doctrine of *Enelow v. New York Life Insurance Co.*, 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440 (1935), and *Ettelson v. Metropolitan Life Insurance Co.*, 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176 (1942), not under § 1291, as the First Circuit subsequently recognized in *New England Power Co. v. Asiatic Petroleum Corp.*, 456 F.2d 183, 185 n. 1 (1972). See Judge Kaufman's thorough discussion in *Standard Chlorine Co. of Delaware, Inc. v. Leonard*, 384 F.2d 304, 306–08 (2 Cir. 1967). Failure to take an authorized appeal from an interlocutory order does not preclude raising the question on appeal from the final judgment. *Victor Talking Machine Co. v. George*, 105 F.2d 697, 699 (3 Cir.) (Maris, *J.*), *cert. denied*, 308 U.S. 611, 60 S.Ct. 176, 84 L.Ed. 511 (1939); *Western States Machine Co. v. S. S. Hepworth Co.*, 152 F.2d 79, 80 (2 Cir.), *cert. denied*, 325 U.S. 873, 65 S.Ct. 1414, 89 L.Ed. 1991 (1945); *Baldwin v. Redwood City*, 540 F.2d 1360, 1364 (9 Cir. 1976), *cert. denied sub nom. Leipzig v. Baldwin*, 431 U.S. 913, 97 S.Ct.

2173, 53 L.Ed.2d 223 (1977); 9 Moore, *Federal Practice* ¶ 110.18 (1975).

At first blush the contention that an agreement among competitors to insist on arbitration clauses in contracts with a category of employees violates the antitrust law seems surprising. Judge Learned Hand said in *Murray Oil Products Co. v. Mitsui & Co.*, 146 F.2d 381, 383 (2 Cir. 1944), although in language later disapproved by the Supreme Court, see *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 202–03, 76 S.Ct. 273, 100 L.Ed. 199 (1956), "[a]rbitration is merely a form of trial, to be adopted in the action itself, in place of the trial at common law . . . ." Statements that policy favors arbitration are legion, see e. g., *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 410 (2 Cir. 1959), *cert. dismissed*, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960) (Medina, *J.*); *World Brilliance Corp. v. Bethlehem Steel Co.*, 342 F.2d 362, 365 (2 Cir. 1965). Without consideration of the effect of the antitrust laws we have upheld the validity of the clause in the NYSE Constitution compelling members to agree to arbitration not only when invoked by one member against another, *Coenen v. R. W. Pressprich & Co.*, 453 F.2d 1209, 1212–14, *cert. denied*, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972), see also *In re Revenue Properties Litigation Cases*, 451 F.2d 310, 312–13 (1 Cir. 1971); *Tullis v. Kohlmeyer*, 551 F.2d 632 (5 Cir. 1977), but also when invoked by a nonmember against a member. *Axelrod & Co. v. Kordich, Victor & Neufeld*, 451 F.2d 838 (1971); *Sobel v. Hertz, Warner & Co., supra*, 469 F.2d at 1214.[7] There must be many industries where arbitration is made compulsory in

---

**6.** We have used the phrase "might well" rather than the more expectable "would" because of the proliferation of functionally non-final orders that may be considered as "final" under *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Query whether a party against whom a *Cohen*-type final order was rendered but excusably failed to recognize it to be such should be precluded from questioning it on appeal from the truly final judgment, if this point has not been mooted, by his failure to take an immediate appeal?

**7.** Although *Ayres v. Merrill Lynch, Pierce, Fenner & Smith*, 538 F.2d 532, 538 (3 Cir.), *cert.*

*denied*, 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1976), held that arbitration under NYSE Rule 347 could not be compelled under the particular circumstances there involved, this was on the ground that the essential nature of the dispute was between the employee *qua* seller and the employer *qua* buyer, and thus within the reasoning of *Wilko v. Swan, supra*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168; cf. *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 513–14, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); no suggestion was made that the compelled agreement violated the antitrust laws.

disputes not only between agreeing members but between a member and a nonmember, perhaps not by formal agreement among the competitors but by the custom of the trade, embodied in standard contracts. We expect, just as one example, that it would be nigh impossible to charter a ship or to fix a charter without agreeing to arbitration, see Gilmore & Black, *The Law of Admiralty* 196 & n. 10 (2 ed. 1975). Cf. *id.* at 582–83 (standard salvage agreement providing for arbitration). Limitation of workers to grievance procedures, usually culminating in arbitration, is a common provision in collective bargaining agreements, even with multiple employers having the dominance of an industry comparable to that of members of NYSE. Although some of these examples can be distinguished (e. g., that arbitration of an employee's grievance pursuant to a collective bargaining agreement is "voluntary"), the fact is that in a large part of our economy parties have become subject to a regime of arbitration when some might have preferred a judicial solution, and the development has been viewed as salutary.

Compelling all member firms to include an arbitration clause in contracts with registered representatives does not inhibit the freedom of any firm in competing for business or of any investor in seeking the firm that will give him the best and cheapest service. Drayer argues, however, that the clause compelling member firms and registered representatives to arbitrate their disputes does inhibit member firms in competing for the services of registered representatives by acceding to the desires of a prospective employee who has a strong preference for the settlement of disputes by the courts rather than by arbitration, or, as the point was put in *Dickstein, supra,* 443 F.2d at 787, that it "unreasonably impairs the ability of . . . members to compete with one another in the labor market." We note in this connection that in *Wilko v. Swan, supra,* 346 U.S. 427, 74 S.Ct. 182, 189, 98 L.Ed. 168, which held that an arbitration provision in an agreement between a NYSE member and a customer was invalid under § 14 of the Securities Act of 1933 as applied

to an action by the customer under § 12(2) of that act, Mr. Justice Frankfurter in his dissent (joined by Mr. Justice Minton) differentiated the *Wilko* case from one "in which the record shows that the plaintiff in opening an account had no choice but to accept the arbitration stipulation, thereby making the stipulation an unconscionable and unenforceable provision in a business transaction" and noted the absence of any contention by the SEC that the standard arbitration clause "was a coercive practice by financial houses against customers incapable of self-protection." 346 U.S. at 440, 74 S.Ct. at 190. Still more important is the decision of the Supreme Court in a case not cited to us, *Paramount Famous Lasky Corp. v. United States,* 282 U.S. 30, 43, 51 S.Ct. 42, 75 L.Ed. 145 (1930), striking down a compulsory arbitration clause between, on the one side, a group of motion picture producers and distributors, controlling 60% of the product, and film boards of trade formed by these companies and others, controlling 98% of the product, and, on the other side, film exhibitors. In a somewhat inscrutable opinion by Mr. Justice McReynolds, the Court found, without explication, that the clause had "the manifest purpose to coerce the Exhibitor and limit the freedom of trade," 282 U.S. at 41. After quoting from a miscellany of largely irrelevant opinions about the purposes of the Sherman Act, Mr. Justice McReynolds declared, 282 U.S. at 43, 51 S.Ct. at 45:

It may be that arbitration is well adapted to the needs of the motion picture industry; but when under the guise of arbitration parties enter into unusual arrangements which unreasonably suppress normal competition their action becomes illegal.

The details of the arbitration clause in *Paramount Famous Lasky* were indeed harsh and had operated harshly on exhibitors, as revealed in the Court's statement of the facts, 282 U.S. at 37–41, 51 S.Ct. 42, and further in the Government's brief, see 282 U.S. at 35–36, 51 S.Ct. 42. A further factor which, although not mentioned, must have lurked in the background,

was that many of the distributors themselves were important exhibitors and, indeed, were later found to have conspired with the goal of attaining a monopoly in exhibition, see *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 167–71, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). The date of the decision may also be significant. At common law agreements to arbitrate future controversies were unenforceable, see Judge Frank's comprehensive discussion in *Kulukundis Shipping Co., S. A. v. Amtorg Trading Corp.,* 126 F.2d 978, 982–84 (2 Cir. 1942); see also *Insurance Co. v. Morse,* 87 U.S. (20 Wall.) 445, 450–53, 22 L.Ed. 365 (1874); *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 510 n. 4, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); Sturges & Murphy, *Some Confusing Matters Relating to Arbitration Under the United States Arbitration Act,* 17 Law & Contemp. Problems 580, 581–82 & n. 2 (1952); state laws repealing this rule began to be enacted only in the 1920's, see Simpson, *Specific Enforcement of Arbitration Contracts,* 83 U.Pa.L.Rev. 160, 166–69 & n. 78 (1934); and the Federal Arbitration Act, 43 Stat. 883 (1925), was still in its infancy. While we bow to the authority of *Paramount Famous Lasky,* it is not a decision affording strong basis for extrapolation, see *Dickstein, supra,* 443 F.2d at 787.

At the very least we do not regard *Paramount Famous Lasky* as decreeing that an agreement among competitors to insist on an arbitration clause in contracts with a category of employees is a *per se* violation of the antitrust laws. While Mr. Justice Black included group boycotts in his list of *per se* violations, *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), he cited to *Fashion Originators' Guild of America, Inc. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949

(1941), and not also to *Paramount Famous Lasky.* As said in Sullivan, *Antitrust* 256 (1977):

While the boycott concept is infinitely expandable, the *per se* doctrine ought not to be. By one frequently encountered use of the term, any concerted refusal to deal is labeled a boycott. If the term boycott is used in this way then all boycotts are not *per se* unlawful, for many concerted refusals to deal lack the distinguishing characteristics which invite application of the *per se* doctrine; one cannot say of them that they always or almost always do substantial harm to competition, that they seldom benefit it, and then only slightly, and that the cases showing a net benefit are hard to identify. As noted earlier, one can say these things about a concerted refusal aimed at depriving competitors of some needed resource, and thus making it harder for them to compete. It is this kind of exclusionary practice, which is in this book called a classic or explicit boycott, to which the *per se* doctrine properly applies. Failure to attend to the distinction between classic boycotts (and arrangements tending toward the same effect) and other concerted refusals to deal often leads to confusion. Some concerted refusals other than classic boycotts may be harmful to competition; others may not. If it be incorrectly assumed that all concerted refusals are comprehended by the *per se* doctrine, which ought only to be applied to classic boycotts, considerable stress is felt.

Viewing the matter in this light we consider the agreement here at issue as being within the rule of reason, quite apart from the effect of the Securities Exchange Act.[8]

---

**8.** None of the cases cited by plaintiff is to the contrary. A number of them held that allegations that the defendants had a "no-switching" covenant, which precluded the parties from hiring for a specified time any former employee of a competitor, stated a claim under the Sherman Act. See *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *Nichols v. Spencer International Press, Inc.,* 371 F.2d 332 (7 Cir. 1967); *Quino-*

*nez v. National Association of Securities Dealers, Inc.,* 540 F.2d 824 (5 Cir. 1976). In another case, the Court held illegal a requirement that prospective employers and employees surrender the power to negotiate employment terms, including such essential items as the level of wages and the position the employee would occupy, to an employers' association, *Anderson v. Shipowners Association of the Pacific Coast,* 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298 (1926).

However, we need not rest our decision solely on this ground in light of our decision in *Jacobi v. Bache & Co., Inc.*, 520 F.2d 1231, 1237–39 (1975), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976). We there read *Silver v. New York Stock Exchange*, 373 U.S. 341, 360–61, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), "to mean that within the area of supervised self-regulation contemplated by the Securities Exchange Act, *per se* concepts are generally displaced and the courts are to examine whether the particular restraint, even though it would be a *per se* violation if performed by others, was reasonable." 520 F.2d at 1238.

Some argument that Rule 347 is not "within the area of supervised self-regulation contemplated by the Securities Exchange Act" might be thought to be furnished by a Supreme Court decision which was not cited to us. In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973), the Court found the "analytical framework" of *Silver* instructive, 414 U.S. at 126, 94 S.Ct. 383, in determining whether § 229 of the California Labor Code, which affords a wage-earner a right of action to recover unpaid wages regardless of any private agreement to arbitrate, was preempted by the regulatory authority delegated to the Exchange, specifically by Rule 347 (then Rule 347(b)). Merrill Lynch contended that compulsory arbitration fell under the "Exchange's mandate to protect the invest-

ing public and to insure just and equitable trade practices" because

> confidence in the industry and in the integrity and ability of its members has been jeopardized by failures of major brokerage houses with consequent substantial losses to the public. Investor confidence would be further undermined . . . by protracted litigation between member firms and their employees over disputes that arise out of employment relationships; public airing of every claim of this kind will erode confidence in the market; and arbitration, on the other hand, will internalize these disputes and provide an expeditious and economical method of resolution by arbitrators familiar with industry customs and practices.

414 U.S. at 134, 94 S.Ct. at 393. To this, the Court responded:

> To begin with the obvious, there is nothing in the Act and there is no Commission rule or regulation that specifies arbitration as the favored means of resolving employer-employee disputes. It is also clear that Rule 347(b) would not be subject to the Commission's modification or review under § 19(b). The United States, as *amicus*, concedes as much, and we conclude, as the Government suggests, that the relationship between compulsory employer-employee arbitration and fair dealing and investor protection is "extremely attenuated and peripheral, if it exists at all." [9]

*United States v. Women's Sportswear Manufacturers Association*, 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed.2d 805 (1949), prohibited an association of contractors from requiring jobbers to give work only to members. Citing evidence that the association policed members' prices and excluded newcomers in the trade from membership, the Court concluded that "the intent and effect of the agreement is substantially to restrict competition and to control prices and markets." 336 U.S. at 463, 69 S.Ct. at 715. And in *Blalock v. Ladies Professional Golf Association*, 359 F.Supp. 1260 (N.D.Ga.1973), the court found it to be a *per se* violation when competitors exercised their "completely unfettered, subjective discretion," 359 F.Supp. at 1265, to suspend a rival from participation in the sport, but the court's ruling expressly did not cover actions of the LPGA which were less than exclusionary. *Id.* at 1268. Any anticom-

petitive impact of the NYSE's arbitration provision is of a significantly lower order of magnitude than that of the practices proscribed in these cases. See *Dickstein, supra*, 443 F.2d at 787; *Rust, supra*, 352 F.Supp. at 717.

9. Section 6(d) of the 1934 Act, as it stood at the time of the *Ware* decision, conditioned SEC registration of an exchange on the rules of the exchange being "just and adequate to insure fair dealing and to protect investors . . . ." Section 19(b), prior to amendment, authorized the Commission to make such changes in exchange rules as were "necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange or to insure fair administration of such exchange," in respect of such matters as

(1) safeguards in respect of the financial responsibility of members and adequate pro-

414 U.S. at 135, 94 S.Ct. at 393 (footnote omitted). The Court held that the rule did not preempt the California statute.

We need not debate what the effect of *Ware* on this case would be if Congress had left matters as they then were. It did not. The Securities Amendments of 1975, which, so far as here relevant, became effective by December 1, 1975, a month and a half before this action was filed and three months before the defendants moved to stay it pending arbitration, expanded the "area of supervised self-regulation," broadening the objectives of self-regulation and prescribing a more active role for the SEC in the oversight of exchange rulemaking. Section 6(b) of the Securities Exchange Act now provides in relevant part:

> An exchange shall not be registered as a national securities exchange unless the Commission determines that—
>
> \* \* \* \* \* \*
>
> (5) The rules of the exchange are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the exchange.
>
> \* \* \* \* \* \*
>
> (8) The rules of the exchange do not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter.

Under § 19(c) of the Act, the Commission may abrogate, add to, or delete from the rules of any exchange, as it "deems necessary or appropriate to insure the fair administration of the self-regulatory organization, to conform its rules to requirements of this chapter and the rules and regulations thereunder applicable to such organization, or otherwise in furtherance of the purposes of this chapter . . . ." Unlike the prior statute, the amended Act contains no subject matter restrictions on this authority. See S.Rep. No. 94–75, 94th Cong., 1st Sess. 27–28, 31 (1975), U.S. Code Cong. & Admin. News 1975, p. 179. Rule changes proposed by an exchange must be approved by the Commission as being consistent with the requirements of the Act and the rules and regulations thereunder before the changes can become effective. § 19(b)(2). If the rule relates solely to the administration of the exchange, however, the change is effective upon promulgation, and the Commission has 60 days to abrogate the rule if it so chooses and to require refiling and review in the same manner as other proposed changes. § 19(b)(3). See also Exchange Act Rule 19b–4.

vision against the evasion of financial responsibility through the use of corporate forms or special partnerships; (2) the limitation or prohibition of the registration or trading in any security within a specified period after the issuance or primary distribution thereof; (3) the listing or striking from listing of any security; (4) hours of trading; (5) the manner, method, and place of soliciting businesses; (6) fictitious or numbered accounts; (7) the time and method of making settlements, payments, and deliveries and of closing accounts; (8) the reporting of transactions on the exchange and upon tickers maintained by or with the consent of the exchange, including the method of reporting short sales, stopped sales, sales of securities of issuers in default, bankruptcy or receivership, and sales involving other special circumstances; (9) the fixing of reasonable rates of commission, interest, listing, and other charges; (10) minimum units of trading; (11) odd-lot purchases and sales; (12) minimum deposits on margin accounts; and (13) similar matters.

The Court, as noted, found that none of these subject matter categories suggested that "the Commission has review authority with respect to a rule requiring arbitration of employer-employee disputes." 414 U.S. at 135 n. 14, 94 S.Ct. at 393.

With these provisions now the "measure of congressionally delegated authority for self-regulation in the national interest," *Ware, supra,* 414 U.S. at 134, 94 S.Ct. at 393, Rule 347 would seem to fall within them. Whatever the relationship of this rule to the objective of investor protection, it is germane to the goal of market efficiency, reflected in § 6(b) and throughout the 1975 amendments, see, e.g., §§ 2; 11A(a)(1)(C); 15A(b)(6); (9); 17A(a)(1); 19(f); 23(a)(2), and to the objective of fair administration of the Exchange, implicated in § 6(b) and an explicit standard of § 19(c). Registered representatives play an important role in the flow of business on securities exchanges. The arbitration provision enables member firms to rid themselves of registered representatives who, as they believe, are dishonest or ineffective, or who have violated rules of the NYSE, including the "know-your-customer" rule, Rule 405(1), without subjecting themselves to lengthy and costly litigation—including, as here, a request for punitive damages.[10] See also *Rust, supra,* 352 F.Supp. at 718. It is likewise in the interest of fair administration and market efficiency, as well as in the public interest, that honest and ethical registered representatives should have speedy, cheap and effective remedies against their employers. At least, the NYSE is entitled to think this in the absence of any indication otherwise from the SEC.

Unlike the situation that the Court found so troublesome in *Ware,* there are now several avenues for SEC involvement. Section 31(b) of the 1975 Amendments directed the Commission to notify by June 4, 1976, any exchange whose rules were not in compliance with applicable requirements of the Act. Compliance was required within 180 days thereafter or the exchange would face sanctions or abrogation of the offending rules. Further, the reports on the bill specifically charged the Commission with an obligation "to remove existing burdens on competition and to refrain from imposing, or permitting to be imposed, any new regulatory burden 'not necessary or appropriate in furtherance of the purposes' of the Exchange Act." H.Rep. No. 94–229, 94th Cong., 1st Sess. 94 (1975); S.Rep. No. 94–75, *supra* at 13, U.S. Code Cong. & Admin. News 1975, pp. 321, 325. The SEC review of exchange rules has not implicated Rule 347. See Release No. 34–12157 (Mar. 2, 1976); Release No. 34–13027 (Dec. 1, 1976); Release No. 14002 (Sept. 27, 1977). Nor has the Commission sought in any way to exercise its power under § 19(c) to alter the NYSE arbitration provisions. Long prior to the 1975 amendments the Commission had shown its familiarity with NYSE's arbitration procedures for disputes between members and nonmembers (including registered representatives) and indicated general approval of them, 2 Report of Special Study of Securities Markets 559–61 (1963). Since the amendments it has approved changes in the arbitration procedures of various exchanges. See, e.g., SEC Release No. 34–11915 (Dec. 11, 1975) (American Stock Exchange); Release No. 34–13220 (Jan. 28, 1977) (Chicago Board Options Exchange, Inc.); Release No. 34–13756 (July 15, 1977) (American Stock Exchange).[11] Appellant has cited to us no instance in which the Commission has disapproved an exchange's arbitration provisions. While we are aware of the dangers of reading too much into the Commission's silence, appellant has not met his burden of showing that the challenged rule is not germane to the purposes of the securities laws, *Jacobi, supra,* 520 F.2d at 1239, and thus it is valid if reasonable, as we find it to be, even if apart from the Securities Exchange Act, it would constitute a *per se* violation. We deem it immaterial that Drayer's employment began and his discharge occurred before the effective

---

10. Nothing in the *Ware* decision is contrary to this, as Merrill Lynch there contended only that the arbitration provision was essential to the maintenance of investor confidence. 414 U.S. at 135–136, 94 S.Ct. 383.

11. The Commission has also proposed establishment of a uniform system for resolution of disputes between investors and their brokers and dealers. See SEC Release No. 34–12528 (June 11, 1976); Release No. 34–12974 (Nov. 15, 1976); Release No. 34–13470 (Apr. 25, 1977).

date of the 1975 amendments; the propriety of invoking the arbitration agreement should be judged under the law existing when defendants sought to have it applied. See *Crane v. Hahlo*, 258 U.S. 142, 42 S.Ct. 214, 66 L.Ed. 514 (1922); *Pennsylvania Power & Light Co. v. FPC*, 139 F.2d 445 (3 Cir. 1943), *cert. denied*, 321 U.S. 798, 64 S.Ct. 938, 88 L.Ed. 1086 (1944); *Montana Power Co. v. FPC*, 144 U.S.App.D.C. 263, 445 F.2d 739, 747 (1970) (*en banc*), *cert. denied*, 400 U.S. 1013, 91 S.Ct. 566, 27 L.Ed.2d 627 (1971).

■ Drayer's final point is that however all this might otherwise stand, compulsory arbitration of disputes between NYSE members and registered representatives falls outside the perimeter of the rule of reason because of the composition of the arbitral tribunal. Cf. *Silver, supra*, 373 U.S. at 364, 83 S.Ct. at 1260 (Exchange Act "affords no justification for anticompetitive collective action taken without according fair procedures."). Section 6 of Article VIII of the NYSE Constitution provides that a controversy between a member and a nonmember in which proceedings are to be held in New York City and the amount in controversy (exclusive of interest and costs) is more than $10,000, shall be determined by five arbitrators to be selected by lot by NYSE's Arbitration Director. One arbitrator is to be selected from NYSE's Board of Arbitration; the Board is composed solely of members and allied members of NYSE chosen by the Chairman, NYSE Const., Art. VIII, § 4.[12] A second is to be a member of a panel, also appointed by the Chairman, "composed of persons engaged in the securities business." *Id.* The other three are to be chosen from a panel, similarly appointed, of persons not engaged in the securities business. Drayer's complaint is essentially that this method of selection departs from two widely accepted methods for choosing arbitrators—one in which each party selects an arbitrator and the two so selected agree on a third, with some neutral source empowered to break a deadlock, and another in which selection of the arbitrators is left to some wholly neutral organization such as the American Arbitration Association.

We do not think that, absent evidence of actual unfairness in the operation of the NYSE arbitration tribunals, cf. *Paramount Famous Lasky, supra*, 282 U.S. at 35–36, 51 S.Ct. 42, their composition is so improper as to invalidate the program under the antitrust laws. The mere fact that the three members not engaged in the securities business are drawn from a panel appointed by the Chairman of NYSE does not reflect upon their fairness in a dispute between a member and a registered representative; the arduous and generally thankless task of acting as an arbitrator represents rendition of a service rather than receipt of a perquisite. Such difficulty as exists comes from the required presence of a member of NYSE and another person "engaged in the securities business," who, of course, could be a registered representative but apparently rarely is. The Special Study, *supra*, noted the composition of the arbitration tribunal in controversies between members and nonmembers without objection. It also noted that for the years 1957–1961, the claimant had prevailed in 53 cases and had lost in 69.[13] Registered representatives have a trade association, the Association of Investment Brokers, see *Jacobi, supra*, 520 F.2d at 1235; presumably the Association would have complained to the SEC if it believed the arbitration procedure was working unfairly. On what we have before us we cannot say that NYSE's compulsory

---

**12.** The nonmember may elect to have the case heard by three arbitrators from the NYSE Board of Arbitrators, NYSE Const., Art. VIII, § 6(c), an option which understandably was not pursued by Drayer in this litigation.

**13.** Five of these decisions were in disputes between members, allied members, and member organizations. Aside from these cases, most claimants were nonmembers. Special Study, *supra* at 560. Focusing on the record for the years 1960–61, the Commission noted the impartiality of both the arbitration director and the arbitrators. *Id.* at 561.

Eight of the controversies during the period covered, not included in these figures, were between firms and registered representatives. The Special Study does not indicate how these were decided.

arbitration procedure for disputes between members and registered representatives was so far beyond the area of permissible self-regulation as to violate the rule of reason.

Affirmed.